Gary PELPHREY, a/k/a "Bats," Edward Buckner, Roberto Moraes, Wesley Crowe, Jeffrey Selman, Marie Shockley, and Roberta "Bobbi" Goldberg, Plaintiffs,

v.

COBB COUNTY, GEORGIA; Sam Olens, in his official capacity as Chairman of the Cobb County Commission and in his individual capacity; Phillip T. "Murray" Homan, in his official capacity as Chairman of the Cobb County Planning Commission and in his individual capacity, Defendants.

Civil Action No. 1:05–CV–2075–RWS.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 8, 2006.

Gerald R. Weber, Margaret Fletcher Garrett, American Civil Liberties Union Foundation of Georgia, Inc., Atlanta, GA, for Plaintiffs.

Mark Alan Adelman, Office of Cobb County Attorney, Marietta, GA, Larry Hugh Chesin, David F. Walbert, Parks Chesin & Walbert, Atlanta, GA, for Defendants.

## *ORDER*

STORY, District Judge.

In this action, seven Cobb County taxpayers challenge the invocation practices of the Cobb County Board of Commissioners (the "Board") and the Planning Commission (collectively, the "Commissions"). Plaintiffs argue that "sectarian prayers" offered by invited guests who participate in the invocation opportunity provided by the Commissions—and, in particular, those prayers mentioning "Jesus," "Christ," or "Jesus Christ"—violate the Establishment Clause of the First Amendment to the United States Constitution. (*See* Am. Verified Compl. [5] at Preliminary Statement.)[1] Plaintiffs seek a judgment (i) de-

---

1. In their Amended Complaint, Plaintiffs additionally assert that the practice offends certain provisions of the Georgia Constitution.

The Court expressed its serious doubts as to the merits of any such claim in its July 13, 2006 Order [26] denying Plaintiffs' Motion for

claring that Defendants' "sponsorship" of sectarian prayers is constitutionally impermissible; (ii) enjoining Defendants "from knowingly and intentionally allowing sectarian prayers at County government meetings, making any further expenditures of public funds, and taking any further action to sponsor sectarian prayers at Cobb County government meetings; and requiring the Defendants, their successors, and assigns to advise anyone conducting a prayer as part of the City Council meeting that sectarian prayers are not permitted"; (iii) awarding them nominal damages, costs, and fees. (*See id.* at Prayer for Relief.)

In an Order dated January 13, 2006[26], the Court denied Plaintiffs' motion for preliminary injunction. *See Pelphrey v. Cobb County, Ga.,* 410 F.Supp.2d 1324 (N.D.Ga. 2006). In doing so, it relied extensively on the Supreme Court's 1983 decision in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), in which a majority of the Court, citing legislative prayer's "unambiguous and unbroken history of more than 200 years," upheld a challenged legislative invocation practice. *See* 463 U.S. at 791, 103 S.Ct. 3330. After carefully examining the contours of the majority's holding in *Marsh,* the Court found that Plaintiffs had failed in their burden to show a substantial likelihood of success on the merits. *Pelphrey,* 410 F.Supp.2d at 1349.

In denying Plaintiffs' motion, this Court rejected their assertion that the Supreme Court's decision in *Marsh* "only applies to *nonsectarian* legislative prayer," and that "legislative prayers that refer to Jesus, Christ, or Jesus Christ … are unconstitutional regardless of the unique history of

Preliminary Injunction, and Plaintiffs have not pursued the issue further in their summary judgment papers.

legislative prayer generally." *See* Pls.' Mot. for Prelim. Inj.[2] at 15–16 (emphasis in original); *see also Pelphrey,* 410 F.Supp.2d at 1339 (so holding). While acknowledging the judicial economy that could be achieved by adopting such a *per se* rule, the Court found the import of *Marsh* to be more nuanced:

> [T]he Court does not believe the Supreme Court's precedent in the arena of legislative prayer can be reduced to a requirement that all sectarian verbiage be excised from invocations. Rather, what it perceives as proscribed by the Supreme Court is an impermissible motive in the selection of clergy to provide legislative invocations; an exploitation of the allowance of an invocation opportunity by the legislature to promote the beliefs of one religious sect, or to disparage those of any other; or the maintenance of a practice that conveys the impression that the government has purposely elected to prefer one religious view to the exclusion of those of other faiths. The focus of each proscription, in all events, is not on a "particular prayer," but on the invocation practice as a whole.

*Pelphrey,* 410 F.Supp.2d at 1345–46.

Since this Court's January 2006 decision, the parties to this litigation have engaged in extensive discovery, and have now submitted cross-motions for summary judgment. Having reviewed the record, the Court now enters the following Order.

### Factual Background

The core facts giving rise to this controversy are, for the most part, undisputed. To the extent factual issues exist, moreover, the parties have consented to have such issues decided by the Court on the basis of the materials in the record. (*See* June 8, 2006 Order [37] at ¶ 6.) [2]

2. The Court endeavors to set forth in this section those facts which are undisputed. For ease of reference, it supports its summary of the facts with citations to the parties' respective Statements of Undisputed Facts. To

## I. The Practices of the Commissions

### A. The Invocation Practice

The Commissions have long maintained a practice of beginning each legislative meeting with an invocational prayer and the Pledge of Allegiance. (*See* Pls.' Statement of Material Facts [52] at ¶¶ 49 & 66 [hereinafter "PSMF"]; Defs.' Statement of Material Facts [49] at ¶¶ 13 & 23 [hereinafter "DSMF"].) The prayer is not provided by a member of the Commissions or a paid chaplain, but typically, an individual selected from one of the community's many religious institutions. (*See* DSMF at ¶¶ 14–15.) The individuals providing the prayer receive no compensation for their service, although the County expends funds (both in terms of physical materials and time) in selecting, inviting, and thanking volunteers. (*See* PSMF at ¶¶ 62–65, 74–77; DSMF at ¶ 15.)

At the beginning of each Board meeting, the Chairman introduces the invocational speaker and the person selected to recite the Pledge, and invites those who wish to do so to stand. (*See* DSMF at ¶¶ 60–61.) The practices employed by the Planning Commission are similar. (*See* DSMF at ¶ 89.).

The evidence presented by Defendants suggests that "the large majority of religious institutions in Cobb County are Christian[.]" (*See* Richardson Aff. [13] ¶ 12; Martin Aff. [13] ¶ 12.)[3] Likewise, and perhaps not surprisingly, the overwhelming majority of invocational speakers, to the extent their faiths can be identified from the record, are Christian. (*See* Richardson Aff. [13] ¶ 12; Martin Aff. [13] ¶ 12.) Indeed, data compiled by the ACLU indicate that, between January 1988 and August 2005, 96.6% of the speakers providing the invocation at Commission meetings, to the extent their "faith was discernable," were Christian. (*See* PSMF at ¶¶ 2 & 28.)[4] During this time, adherents to the Jewish and Unitarian Universalist faiths also provided invocations, and, more recently, a Muslim Imam from the County's only mosque has also offered the opening prayer. (*See* PSMF at ¶¶ 3 & 28.)[5]

As it relates to the content of the challenged invocations, discovery has produced little that was not before the Court at the time it ruled on the preliminary injunction motion. The County plays no role in the pre-censorship of an invited speaker's prayer, and does not appear to direct

the extent a genuine issue could be said to exist *vis-a-vis* any fact set forth in this decision, the Court's recitation of that fact may be construed as a finding under Federal Rule of Civil Procedure 52.

**3.** Defendants state that the Christian churches account for approximately 98% of the houses of worship in Cobb County. (*See* Defs.' Resp. to Pls.' Mot. for Summ. J. [63] at 15–16.) Due to the questionable validity of the data used by Defendants to support their statistics, however, the Court does not adopt them here as conclusive proof of the religious demographics of Cobb County. (*See* Pls.' Reply in Supp. of Mot. for Summ. J. [65] at 11 & n. 8 (detailing inaccuracies).)

**4.** In recent years, these numbers have begun to decline somewhat. For example, in the

Cobb County Board of Commissioners, from 2001 to 2005, the percentage of Christian speakers (out of those persons whose "faith was discernable") ranged from 89% to 95%. (PSMF at ¶¶ 11–14.) In the Cobb County Planning Commission, which meets only eleven times a year, the percentage of Christian speakers during the same time period ranged from 86% to 100%. (*See* PSMF at ¶¶ 32–35 & 66.)

**5.** In 1998, an Imam from the Islamic Center of Atlanta also provided the invocation before the Planning Commission. (*See* Parikh Aff. [52] at Attach. 2.) Moreover, in 1991, a representative from a local Baha'i assembly gave the invocation before the Board of Commissioners. (*Id.* at Attach. 3.)

speakers respecting the proper boundaries of invocational prayer. (*See* DSMF at ¶ 18.)[6] A survey of transcribed invocations over the last decade indicates that 70% of the invocations given before the Board, and 68% of those given before the Planning Commission, contained some sectarian, Christian reference—figures slightly lower than this Court assumed in its January 13, 2006 decision. *See* PSMF at ¶¶ 15 & 36; *Pelphrey*, 410 F.Supp.2d at 1326 n. 3.[7] These references, though varied, typically took the form of references to "our Heavenly Father" or "in Jesus' name we pray." (*See* DSMF at ¶¶ 19–21.) A review of the record reveals only a minority of occasions where more lengthy or elaborate references were made to a particular religion's scripture or concepts unique to one faith. (*See* Parikh Aff. [52] at Attachs. 1 & 2.)

During this time, Christian, Jewish, and Muslim speakers all recited prayers that Plaintiffs characterize as "sectarian." (*See* *id.*)[8] The prayers offered by many clergy, however, including some who were invited back on multiple occasions, were bereft of any sectarian reference. (*See* DSMF at ¶ 21; *see also* Defs.' Reply in Supp. of Mot. for Summ. J. [64] at 7 n. 5.)

**B. Selection of the Speaker**

In its last Order, this Court observed that the record, as it then stood, did "not describe the precise process employed by the County to select a speaker for any given Commission meeting." *See* *Pelphrey*, 410 F.Supp.2d at 1326. While the record respecting the identity of invocational speakers and content of the invocations has changed little since that time, the parties have conducted extensive discovery respecting the selection process, and a much clearer picture of the Commissions' practices is now before the Court.

It appears that the responsibility for selecting invocational speakers is that of an administrative specialist (*vis-a-vis* the

---

**6.** Plaintiffs attempt to counter this point by directing the Court to the deposition testimony of Tim Lee, a Cobb County Commissioner. Mr. Lee testified, in response to a series of hypotheticals, that he would probably make a point of order and ask the Chairman to interrupt a speaker who began shouting obscenities, discussing matters that would be heard by the Board, disparaging other religions, or disparaging citizens. (*See* Lee Dep. at 36–40.) There is no evidence that the Commissions have ever been confronted with such incidents, however, nor is there evidence that any speaker has been informed of these or other probable restrictions on the content of permissible invocations.

**7.** As it relates to the Board, the number of what the ACLU deems "Christian-specific" references have declined somewhat in recent years. Beginning in 2003, when Cobb County citizens first voiced concerns about the invocation practice, the number of sectarian references dropped significantly, approaching the 50% mark. (*See* PSMF at ¶¶ 24–25.) Although Plaintiffs attribute this decline to their complaints and the actions of the ACLU, the

impetus behind the decline remains unclear. Notably, there is no indication that the individuals responsible for selecting invocational speakers knew of the complaints, or directed the volunteers to alter the content of their prayers.

A similar decline was not seen in invocations provided before the Planning Commission. (*See* *id.* at ¶¶ 45–47.)

**8.** Some of the prayers denominated as "sectarian" by Plaintiffs appear, at least to the Court, rather ecumenical. For example, Plaintiffs label the following prayer, given by a Baptist minister, as "sectarian":

And as we think of the time of the year when men turn their thoughts toward the great moral aspect and the recognition of a power that is greater than we, whether it be Ramadan or Chanukah or Christmas or Quansa, whatever the case me be, we thank you that men do look to a higher power. We thank you and praise you, and we appreciate you. And I pray personally in Jesus' name. Amen.

(*See* Parikh Aff. [52] at Attach. 1 at 20.)

Board) and a deputy clerk (*vis-a-vis* the Planning Commission) employed by the County. (*See* PSMF at ¶¶ 53 & 70; DSMF at ¶¶ 27, 30, 73–76.) Both are essentially given autonomy in the selection of speakers, and employ different methods of selection.

The administrative specialist who selects speakers on behalf of the Board, Ms. Martin, compiles a list of religious organizations in Cobb County, which she pulls from a variety of sources, including, *inter alia,* the Yellow Pages, the Internet (including the Chamber of Commerce website), as well as business cards and leaflets she finds at public functions and receives through the mail. (DSMF at ¶¶ 33–35; PSMF at ¶¶ 54–55.) Although a seemingly rare occurrence, moreover, Ms. Martin has also received information respecting certain religious organizations from Board members, including, in 2004, information about the County's mosque. (*See* DSMF at ¶¶ 38–41; PSMF at ¶ 56.) She has never been approached by an "ordinary" citizen of Cobb County respecting invocational speakers, either to submit recommendations or to complain about the County's practices. (DSMF at ¶¶ 45–46.)

The list compiled by Ms. Martin is entitled, "Places of Worship," and comprises five pages of spreadsheets (hereinafter, the "Master List"). It is organized alphabetically according to denomination and/or faith, and, within each denomination or faith, by the name of individual congregations. (*See* DSMF at ¶ 37.) The overwhelming majority of organizations identified on this list are Christian, although among them there is great diversity in denomination and cultural affiliation (*e.g.,* Brazilian, Korean). (*See* PSMF at ¶ 57; Def. Ex. 23 [49–27].) In addition, the Master List contains contact information for three Jewish Synagogues, a Unitarian Universalist Congregation, and the Masjid Al–Hedaya Mosque. (*See* Def. Ex. 23.) From this Master List, Ms. Martin randomly selects organizations from a number of denominations and/or faiths, and then contacts those organizations to inquire about a religious leader's willingness to provide the invocation. (*See* DSMF at ¶¶ 50–55; PSMF at ¶ 61.) She endeavors to avoid having speakers from the same religious group speak during consecutive meetings. (*Id.*)

Ms. Martin has testified repeatedly that she does not take into account the beliefs held by a religious group in deciding whom to include on her Master List. (*See* Martin Aff. [13–3] at ¶ 11; Martin Dep. [46] at 81.) The evidence is also undisputed that she has only removed religious leaders from her Master List because (i) she has learned that the organization is not in the County; (ii) the organization's staff has not returned her calls; or, on rare occasions, (iii) a particular organization or leader has asked not to be included on the list. (DSMF at ¶ 48.)

Having said that, there is evidence that Ms. Martin had information in her files, and in particular, a print-out from the Chamber of Commerce website, identifying a Jehovah's Witness congregation and a Baha'i assembly, but those organizations do not appear on the Master List. (*See* PSMF at ¶ 57; Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 6; Martin Dep. at 66–67.) Although Ms. Martin offers equivocal testimony that she intended to contact the Baha'i assembly (and identifies notes she made updating the assembly's address), and that the Jehovah's Witness congregation may have been stricken because of "previous information" given to her by her predecessor,[9] she admits failing to recall

---

9. Earlier in her deposition, Ms. Martin explained that her predecessor informed her that Jehovah's Witnesses, as well as members of the Church of Jesus Christ of Latter Day Saints, declined invitations to provide invocations on the basis of their beliefs. (*See* Martin Dep. at 18–19, 36–37.) Defendants, in an

the precise reasons for the omissions. (*See* Martin Dep. at 66–68 and Ex. 12.)

There is also evidence that Ms. Martin had a list in her files identifying a Church of Jesus Christ of Latter Day Saints, but that faith similarly fails to appear on the Master List. (*See* PSMF at ¶ 60.) The directory containing that information, which is several pages long, shows question marks next to both the Mormon church and a Jehovah's Witness congregation. (*Id.; see also* Martin Dep. at Ex. 6.) Ms. Martin failed to specifically recall why those marks were placed on the list, but testified that it was her practice to place question marks next to organizations she "was [probably] going to try to contact . . . again." (*See* Martin Dep. at 32, 37–38.)

Plaintiffs also complain that Ms. Martin's list omits other religious groups located in Cobb County, including a Buddhist Assembly, a Hindu Temple, three Messianic Jewish congregations, and a Christian Science church. (*See* PSMF at ¶ 57.) They appear to concede, however, that these organizations are not listed in the Yellow Pages. (*See* Parikh Aff. at ¶ 29.)

The practice employed by the deputy clerk on behalf of the Planning Commission, Ms. Richardson, differs from that used by Ms. Martin.[10] Ms. Richardson, like her predecessor, relies primarily on the Yellow Pages to locate religious organizations whose leaders might be interested in providing the invocation, although, more recently, she also began contacting leaders who volunteer as part of the Chaplain Program for the Cobb County Police and Fire Departments. (*See* DSMF at ¶¶ 76–78; PSMF at ¶ 71.) She has never received requests from her supervisors or any Planning Commission member respecting which leaders to invite to provide the invocation. (*See* DSMF at ¶¶ 79–80.) Like Ms. Martin, moreover, Ms. Richardson has indicated that she made attempts to ensure that different denominations were represented at Planning Commission meetings. (*See* PSMF at ¶ 74.)

A copy of the phonebook used by Ms. Richardson in 2003–04 shows a dark, straight, continuous, vertical line through the categories listed in the Yellow Pages surrounding "Churches." (*See* Def. Ex. 28 [49–32].) For example, Chiropractors, Church Furnishings, and Church Supplies & Services, and then Cigar & Cigarette Accessories and Circuit Board Assembly Repairs are crossed out. (*Id.*) There is also a similar, somewhat lighter line drawn through a series of listings on the lower lefthand corner of one page in the phonebook, drawn continuously through Churches–Islamic, Churches–Jehovah's Witnesses, Churches–Jewish, and Churches–Latter Day Saints. (*Id.; see also* Richardson Dep. at 15.) No similar line is drawn through any other denomination or religious group. (*See* PSMF at ¶ 72; Richardson Dep. at 12–13.)

Although Ms. Richardson purported not to recall making this notation on her copy of the phonebook, she responded "No" to the inquiry, "Would someone else be making notations on your phone book list?" (*See* Martin Dep. at 11; *see also id.* at 18.) She also stated that she did not "have a recollection at this point" as to why these groups were crossed-out, but testified that "[g]enerally [the notation] would indicate

effort to bolster this explanation, point to what they contend is the official website of the Jehovah's Witnesses, tending to indicate that such separation between church and state is indeed a tenet of the faith. This latter evidence, however, does not appear to be in admissible form, and is therefore not considered by the Court.

10. During the pendency of this litigation, Ms. Richardson "switch[ed] positions," and now serves as an administrative supervisor. (*See* Richardson Dep. at 4.)

that [she] had some contact at some point and generally was refused." (*See* Richardson Dep. at 13.) The record indicates that none of the faith groups struck out in the 2003–04 copy of the phonebook were asked to provide an invocation during those years. (*See* PSMF at ¶ 72.)

The 2005 copy of the Yellow Pages does not contain these notations. Rather, the County's mosque has a star next to it, and all of the synagogues are "checked." (*See* Richardson Dep. at Ex. 18.) Ms. Richardson contacted both a synagogue and a mosque in 2005 to provide the invocation, and it is clear that at least one Jewish Rabbi gave the opening prayer. (*See* PSMF at ¶¶ 35 & 72.)

## II. Plaintiffs' Objections to the Invocation Practice

Prior to initiating this lawsuit, Messrs. Selman, Crowe, and Pelphrey voiced their opposition to the invocation practice employed by the Commissions. (*See* PSMF at ¶¶ 88–90; DSMF at ¶¶ 63–64.) Mr. Selman, moreover, provided a list of proposed speakers to Commissioner Tim Lee and Planning Commissioner Bob Ott. (*See* PSMF at ¶ 89.) This list included a Hindu individual, a United Unitarian, and an Atheist, as well as a Jewish Rabbi. (*See* Defs.' Ex. 27[49].) It also provided contact information for Muslim, Mormon, and Buddhist organizations, and enumerated several other religious groups for which Mr. Selman listed no proposed speaker or contact information (*e.g.*, Agnostic, Shinto, Taoist, and Wiccan). (*Id.*)

Neither commissioner provided Mr. Selman's suggestions to the administrative personnel tasked with selecting invocational speakers, although at least one of the identified speakers already appeared on Ms. Martin's Master List. (*Id.*) The Court has been directed to no testimony provided by Mr. Ott explaining his reasons for not passing along Mr. Selman's proposals.

Mr. Lee explained, albeit confessing his lack of precise recollection, that he did not pass the list along to Ms. Martin because he understood Mr. Selman's objections to be directed at the invocation practice itself, and, in any event, did not know to whom the list should be given. (*See* DSMF at ¶¶ 66–67; *see also id.* at ¶ 65 (explaining that the list was given to Mr. Lee relatively early in his tenure as a Commissioner).)

Cobb County additionally received correspondence from the ACLU asking that they remove sectarian references from the invocations. (*See* Am. Verified Compl. [5] at Ex. G.) When the Commissions declined to alter the challenged practices after receiving these requests, Plaintiffs, represented by the ACLU, brought suit. They summarized their grievances as follows:

> The Plaintiffs object to the sectarian prayers at Cobb County government meetings because they invoke a specific god—a Christian God—to the exclusion of all other Gods. The Plaintiffs are offended and often feel repressed by this practice. Each time they attend a government meeting the Plaintiffs are affronted by Defendants' overtly Christian prayers and subject to unavoidable and unwelcome religious messages sponsored by the County. Mr. Pelphrey believes that the government's use of sectarian prayer is demeaning to his religion. The prayers cause other Plaintiffs to feel like outsiders in their own community and unwelcome at government meetings. Furthermore, they are offended because the sectarian prayers are an unconstitutional endorsement of religion and because the prayers trivialize religion.

(*See* Am. Verified Compl. ¶ 18.)

## Discussion

### I. Preliminary Matters

The Court begins its discussion by commending counsel for both Plaintiffs and

Defendants for the considerable acumen they have demonstrated in presenting well-prepared, thoughtful briefs respecting this complex area of constitutional law. Before turning to the merits of the parties' respective positions, moreover, the Court takes this opportunity to address certain arguments raised by Plaintiffs in their most recent filings. *See Pelphrey,* 410 F.Supp.2d 1324. Because those contentions, directly or indirectly, take issue with the standards this Court will apply in evaluating the constitutionality of the Commissions' practices, they will be addressed here, before the Court endeavors to apply those standards to the facts of this case.

Initially, Plaintiffs suggest that the Court invented a novel paradigm for evaluating the ability of an invocation practice to survive Establishment Clause scrutiny. (*See* Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 9, 25–26.) They submit "that *Marsh* is the more appropriate test to apply to legislative prayers" (*see id.* at 9), and that that "test" can best be understood as "whether a legislative prayer practice *frequently* includes sectarian prayers." (*Id.* at 26 (emphasis supplied).) Plaintiffs contend that they do not presently take, and indeed, have never taken the position that the inclusion of isolated sectarian references makes an invocation practice unconstitutional (*see id.* at 10; Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. [61] at 11), but rather, only argue that the *frequency* of the sectarian references involved in the instant case offends the Establishment Clause.

The Court finds Plaintiffs' arguments troubling in several respects. First, it is difficult to reconcile Plaintiffs' current position, which concedes that *some* level of sectarian content is permissible in the context of legislative prayer, with that taken earlier in this litigation. (*See* Pls.' Mot. for Prelim. Inj. [2] at 15–16 (asserting that *Marsh* "only applies to *nonsectarian* legis-

lative prayer," and that "legislative prayers that refer to Jesus, Christ, or Jesus Christ ... are unconstitutional regardless of the unique history of legislative prayer generally") (emphasis in original).) Insofar as Plaintiffs have now retreated somewhat from their earlier espoused *per se* rule, it appears that any disparity between the approach taken by the Court in its January 13, 2006 Order and that advocated by Plaintiffs here may be more one of degree than of limited permissibility versus total proscription.

Second, Plaintiffs' contention that the Court "formulated" a new standard to be applied in the context of legislative prayer is an inaccurate depiction of what the Court endeavored to accomplish in its January 13, 2006 Order. This Court, addressing Plaintiffs' Motion for a Preliminary Injunction, sought to apply faithfully the holding of *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). It acknowledged:

> *Marsh* is the centerpiece of the Supreme Court's legislative prayer jurisprudence. It is the only case in which the Court has been directly confronted with the constitutionality of the practice, and the only case that directly purports to articulate a "test," independent from *Lemon,* that governs this unique area of the First Amendment landscape.

*See Pelphrey,* 410 F.Supp.2d at 1339.

To be sure, this Court's construction of *Marsh* does not comport with that which Plaintiffs would have it adopt. And, the Court concedes that, while not unique, *see Snyder v. Murray City Corp.,* 159 F.3d 1227, 1234 (10th Cir.1998) (en banc) (rejecting proposition that "the mere fact a prayer evokes a particular concept of God is ... enough to run afoul of the Establishment Clause"); *Newdow v. Bush,* 355 F.Supp.2d 265, 289 (D.D.C.2005) (isolated sectarian references, without more, insuffi-

cient to offend Establishment Clause), its reading of the decision is in tension with that articulated by the Fourth, Seventh, and Ninth Circuits. *See Wynne v. Town of Great Falls, S.C.,* 376 F.3d 292, 301 (4th Cir.2004) ("The invocations at issue here, which specifically call upon Jesus Christ, are simply not constitutionally acceptable legislative prayer like that approved in *Marsh.*"); cf. *Hinrichs v. Bosma,* 440 F.3d 393, 395 (7th Cir.2006) (split panel) (denying stay pending appeal of lower court order enjoining sectarian prayers as unconstitutional, with disclaimer: "We hope that, by proceeding in this manner, the tentative nature of our analysis at this very early point in the litigation will be plain to all."); *Simpson v. Chesterfield County Board of Supervisors,* 404 F.3d 276, 283 (4th Cir.2005) (continuing to apply *Wynne,* but with emphasis on fact that, there, the invocations, offered by council members, were "pervasively and exclusively sectarian in nature"); *Bacus v. Palo Verde Unified Sch. Dist. Bd. of Edu.,* 52 Fed.Appx. 355, 356–57 (9th Cir.2002) (unpublished decision) (holding that "the [challenged] prayers, almost always 'in the Name of Jesus,' did [impermissibly] advance one faith"; but issuing caveat, "we need not decide whether the prayers 'in the Name of Jesus' would be a permissible solemnization of a legislature-like body, provided that invocations were, as is traditional in Congress, rotated among leaders of different faiths, sects, and denominations").

But adopting a minority view, or even accepting a different construction of a seminal decision, is not tantamount to judicial inventiveness, and this Court does not understand its task as that of conducting a headcount among the federal courts. Despite the fact that *Marsh* is now over twenty years old, this area of the law remains in its nascency, with no apparent consensus having yet emerged respecting the decision's appropriate contours. *See*

Marjorie A. Shields, *Constitutionality of Legislative Prayer Practices,* 2006 A.L.R. 6th 3 (2006) (discussing recent litigation challenging invocational prayer practices); *see also Hinrichs,* 440 F.3d at 403 (Kane, J., dissenting) ("A key dispute in this case, as it appears now, is whether *Marsh* rests on a line drawn between sectarian and nonsectarian legislative prayer. While there is caselaw supporting the proposition that *Marsh* approves of only nonsectarian legislative prayer, there still remain powerful arguments to the contrary, not the least of which is the *Marsh* majority's curious ambiguity on the point."). This Court acknowledged in its prior Order the apparent tension among the Supreme Court's decisions in *Marsh,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019, *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and *County of Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), as well as the several conflicting authorities cited *supra.* Ultimately, however, it concluded that to read into the Establishment Clause an absolute proscription of sectarian references during legislative invocations would do violence to *Marsh.* To the extent that Plaintiffs challenge this Court's interpretation as contrary to what is presently the majority view, this Court acknowledged as much in its January 13, 2006 Order, and, respectfully, maintains its disagreement with those decisions that read *Marsh* as pronouncing a non-sectarian mandate. To be clear, however, this Court has always understood its obligation to be strict application of the precedent set by *Marsh,* and it has never encouraged the adoption of a "new" rule of constitutional law applicable to invocational prayer.

The Court additionally declines to accept Plaintiffs' argument that *Marsh* is properly interpreted as mandating a "straightforward test" which asks "whether a legislative prayer practice frequently includes

sectarian prayers." (*See* Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 25–26.) Initially, the very idea of a "straight-forward" Establishment Clause analysis seems to the Court somewhat of an oxymoron. No message of *Van Orden v. Perry*, 545 U.S. 677, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005), and *McCreary County v. ACLU*, 545 U.S. 844, 125 S.Ct. 2722, 2734, 162 L.Ed.2d 729 (2005), is more clear than that the Establishment Clause tends to elude clear, black-and-white formulations of legality.

And, even if a straight-forward test were attainable in this unique niche of First Amendment law, the Court reads nothing in *Marsh* to indicate that infrequency is the touchstone for constitutionality. The Establishment Clause, as a general matter, tends to insist upon evaluations made in view of all the facts and circumstances surrounding a controversy. Although the parties in this case have presented their arguments largely in the form of statistics, this Court has already expressed its disinclination to resolve the constitutionality of an invocation practice "on numbers alone."[11] *Pelphrey*, 410 F.Supp.2d at 1347.

Plaintiffs additionally argue that this Court was incorrect insofar as it viewed *Marsh* and *Lee* to erect an absolute prohibition on judicial or legislative censorship of invocational prayer. They support their argument that no such prohibition exists with citations to the decisions, cited *supra,* where circuit courts of appeal have imposed injunctions proscribing sectarian references in such prayers, as well as certain language found in Justice Scalia's dissenting opinion in *Lee. See Lee*, 505 U.S. at 640, 112 S.Ct. 2649 (Scalia, J., dissenting)

(finding characterization of principal's suggestion that speaker avoid sectarian references as "control" of prayers "difficult to fathom").

Although the Court can appreciate Plaintiffs' argument (no matter how difficult it is to reconcile with the majority's reasoning in *Lee* ), even assuming that *Marsh* and *Lee* left room for government intervention into the composition of invocational prayer, it would not change this Court's understanding of the fundamental "test" *Marsh* requires it to apply in this context. Whether couched in terms of a prohibition or a pronounced disinclination, one cannot read *Lee* or *Marsh* and perceive any open invitation for the government to play a role in the composition or regulation of invocational prayer. *See Lee,* 505 U.S. at 588, 112 S.Ct. 2649 ("It is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government[ ]' ....") (quoting *Engel v. Vitale*, 370 U.S. 421, 425, 82 S.Ct. 1261, 1264, 8 L.Ed.2d 601 (1962)); *Marsh,* 463 U.S. at 794–95, 103 S.Ct. 3330 ("The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer."). Stated differently, irrespective of whether a violation of *Marsh* compels a court to enjoin sectarian references or ban an invocation practice altogether, the

---

**11.** Though "numbers alone" will not resolve the issue, the Court acknowledges that the pervasiveness of the practice can bear on the analysis of whether the government is maintaining "a practice that conveys the impression that the government has purposely elected to prefer one religious view to the exclusion of those of other faiths." *Pelphrey,* 410 F.Supp.2d at 1346.

"test" for constitutionality, in the view of this Court, remains the same.

## II. Analysis

As the Court explained in its January 13, 2006 Order,

> what it perceives as proscribed by the Supreme Court [in the context of invocational prayer] is an impermissible motive in the selection of clergy to provide legislative invocations; an exploitation of the allowance of an invocation opportunity by the legislature to promote the beliefs of one religious sect, or to disparage those of any other; or the maintenance of a practice that conveys the impression that the government has purposely elected to prefer one religious view to the exclusion of those of other faiths.

*Pelphrey,* 410 F.Supp.2d at 1345–46. It is now the task of the Court to apply those standards to the facts developed through discovery.

In their papers, Plaintiffs have identified three features of the Cobb County Commissions' practices they deem offensive. First, they complain that the overwhelming number of speakers are adherents to the Christian faith. Second, they take issue with what they perceive as "frequent" sectarian references in the prayers offered by invitees. Finally, they urge that the selection procedures employed by the Commissions are violative of the Establishment Clause. Although, as Plaintiffs recognize, the "invocation practice [must be evaluated] as a whole[,]" *see Pelphrey,* 410 F.Supp.2d at 1345–46, the Court, in the interest of clarity, addresses each challenged aspect of the invocation practice separately.[12] It finds the practices employed by the Planning Commission violative of the Establishment Clause, but reaches a contrary conclusion as to the Board.

### A. Identity of Speakers, Content of Prayers

Although the identity of the invocational speakers and the content of their speech was the impetus behind this lawsuit, the Court finds itself with very little to add to its previous discussion of these matters. For all the reasons set forth in its January 13, 2006 Order, the Court does not find either attribute of the Commissions' invocation practices offensive to the principles embodied in *Marsh.*

First, relying on the fact that well over 90% of the speakers who provided the invocation over the past several years were Christian does little to advance Plaintiffs' case. In *Marsh* itself, the Supreme Court itself found nothing constitutionally impermissible in the nearly uninterrupted sixteen year tenure of one Presbyterian minister as chaplain for the Nebraska legislature. *Marsh,* 463 U.S. at 793–94, 103 S.Ct. 3330. To find the high percentage of Christian speakers here renders the County's practices unconstitutional would be difficult to reconcile with that holding.

Likewise, invitees' inclusion of sectarian references in their invocations does not, in the view of this Court, compel a finding of unconstitutionality. While the record now contains a much more exhaustive picture of the invocations offered before the Cobb County Commissions, the Court's earlier

---

**12.** There is also persuasive authority suggesting that, while the focus of the court's inquiry should be on a legislature's *practice,* rather than on a particular prayer, the selection and identity of speakers should be analyzed separately from the content of the prayer. *See Simpson,* 404 F.3d at 282–87 (analyzing content of prayer and selection procedures separately); *see also id.* at 286 ("The Court, neither in *Marsh* nor in *Allegheny,* held that the identity of the prayer-giver, rather than the content of the prayer, was what would 'affiliat[e] the government with any one specific faith or belief.' ").

observations respecting the content of the opening prayers remain virtually unchanged:

The prayers at issue did not invariably contain sectarian Christian references, and indeed, were on a number of occasions given by non-Christian (*e.g.*, Jewish[, Unitarian,] and Muslim) clergy. Even the Christian clergy did not always include in their prayers references to Christ. What is more, the references to exclusively Christian concepts, so far as the Court can tell from the present record, typically consisted merely of the closing, "in Jesus' name we pray" (albeit, on ... occasion,[13] with some additional embellishment).

. . . . .

Cobb County does not employ a chaplain to provide an invocation, nor does it typically have one of its members offer the opening prayer, but rather appears to invite various clergy in the local religious community to offer a prayer at a single meeting. To be sure, many of these speakers, in offering their invocations, identify the deity to whom they direct their prayer. In that respect, they surely convey *their* alignment with one religious creed to the exclusion of others. But viewed cumulatively, given the diversity in the denominations and faiths represented, it is difficult to extrapolate from any one speaker's affiliation a preference on the part of the Cobb County government. Absent any suggestion to the public or in the record that the inclusion of diverse faiths is merely a "token" gesture to mechanically avoid judicial intervention, such a practice, in the view of this Court, militates strongly against a finding that the practice violates the mandates of the Establishment Clause.[14]

Furthermore ..., the sectarian references cited by Plaintiffs appear rather austere and innocuous when measured against those found objectionable in cases such as *Hinrichs* and, indeed, with respect to prayers offered before 1980, *Marsh*. See *Marsh*, 463 U.S. at 823 n. 2, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (Stevens, J., dissenting); *Hinrichs*, 400 F.Supp.2d at 1106–08. From the current record, there is little to suggest the practice employed by the Commissions gave rise to an appearance that the legislative forum was opened by the government to allow speakers to promote a particular religious view, or to expound upon principles of Christian doctrine unique to that faith.

See *Pelphrey*, 410 F.Supp.2d at 1346–48 (emphasis in original).

What is more, it is now clear that, contrary to Plaintiffs' earlier contentions, sectarian references were not relegated to

---

**13.** Reviewing the transcripts of the invocations provided by Plaintiffs, it appears, in all candor, that while infrequent, the sectarian references perhaps more than "rare[ly]" exceeded this brief ending. It remains the case, however, that the substantial majority of the references Plaintiffs deem "sectarian" never went beyond this concluding language, or minor variations thereof. In any event, the record as it now stands is not so different from that initially presented to the Court to warrant a contrary result.

**14.** While, as explained below, the Court finds certain aspects of the selection practices maintained by the Planning Commission during 2003–04 troubling, it remains unpersuaded that "the inclusion of diverse faiths is merely a 'token' gesture to mechanically avoid judicial intervention...." *Pelphrey*, 410 F.Supp.2d at 1347. Viewed as a whole, the Planning Commission's consistent practice of including other faiths in the invocation opportunity (which itself arises only eleven times a year) militates against such a finding. (*See* PSMF at ¶¶ 28 (recognizing that non-Christian speakers, including adherents to the Jewish, Unitarian, and Muslim faiths, provided the invocation in 1994, 1998, 2002, and 2005).)

allusions to the Christian tradition. Volunteers from surrounding synagogues and the Islamic Center of Atlanta also included in their prayers references to concepts central to Judaism or to Islam. (*See* Parikh Aff. [52] at Attachs. 1 & 2) (recounting instances where rabbis' invocations included references to Passover, Hebrew prayers, scriptures contained in the Torah, and the menorah, as well as an instance in which a Muslim Imam "[p]rais[ed] ... Allah, the cherisher and sustainer of the words[,]" "thank[ed] God for sending us Prophet Mohammed[,]" and recited verses from the Koran). To be sure, mirroring the proportion of the speakers from these faiths, such references were more infrequent than those made to Christian concepts. Nevertheless, such diversity in the content of the invocations tends to further militate against a finding that the Commissions' practices have "been exploited to proselytize or advance any one, or to disparage any other, faith or belief[,]" *Marsh*, 463 U.S. at 795, 103 S.Ct. 3330, or that they "have the effect of affiliating the government with any one specific faith or belief." *Allegheny*, 492 U.S. at 603, 109 S.Ct. 3086.

In light of the foregoing, the Court remains unpersuaded that either the identity of the invocational speakers present at Cobb County Commission meetings, or the content of their prayers, takes the challenged practices outside of boundaries drawn by *Marsh*.

## B. Selection Procedures

Although not prominently identified in their original filings, Plaintiffs now take issue with the selection procedures employed by the Commissions to select invocational speakers. *Marsh* made clear that, while not easily established, such a challenge was viable under the Establishment Clause. As explained by this Court in its January 13, 2006 Order,

The first boundary erected to legislative prayer by the Supreme Court relates to the intent of the legislature in its selection of the speaker meant to deliver the invocation. In *Marsh*, the respondent argued that the Nebraska Legislature's practice violated the Establishment Clause because the same Presbyterian clergyman had delivered the opening prayers for sixteen years. Quickly disposing of this argument, the Court rejected the idea that "choosing a clergyman of one denomination advances the beliefs of a particular church." [Cit.] After underscoring that "guest chaplains have officiated at the request of various legislators and as substitutes during Palmer's absences[,]" the Court went on to hold: "*Absent proof that the chaplain's reappointment stemmed from an impermissible motive, we conclude that his long tenure does not in itself conflict with the Establishment Clause.*" [Cit.] The Court did not elaborate in *Marsh* on what motive or motives it would find "impermissible." Read in context, however, the "impermissible motive" prohibition seems directed at the conscious selection of a speaker from one denomination or sect for the purpose of promoting or endorsing the beliefs held by that speaker. That is, the Court appeared to deem constitutionally unacceptable the selection and retention of a particular speaker *because* of that speaker's sectarian affiliation or religious beliefs. [Cit.] The Court indicated, moreover, that the bar for proving such impermissible motive is quite high. It found the virtually uninterrupted sixteen year tenure of a single Presbyterian minister insufficient to demonstrate any "preference" for a particular faith. Instead, it appeared to envision more pronounced evidence of a legislative purpose to sanction one religious viewpoint as a necessary predicate for declaring a legislature's selection of

clergy a violation of the Establishment Clause.

*Pelphrey,* 410 F.Supp.2d at 1336.

Here, the Court approaches the improper motive inquiry by evaluating three aspects of the selection procedures Plaintiffs appear to deem offensive. First, it considers their challenge that using the Yellow Pages to select invocational speakers is itself problematic under the Establishment Clause. Second, the Court evaluates what appears to be an improper motive challenge predicated on Commission members' failure to pass along suggestions provided by Mr. Selman to the administrative personnel responsible for overseeing the selection process. Finally, it considers the specific methods employed by both the Board and the Planning Commission.

■ Plaintiffs' first argument is summarized in their papers as follows:

Limiting the search for clergy to the Yellow Pages is intrinsically biased towards large, wealthy, well-established, and Christian churches. To advertise in the Yellow Pages, a faith group must go through procedures to place the advertisement and must pay for the advertisement. Thus, the Cobb invocation may only be given by clergy who have the money, time, and resources to buy a Yellow Pages advertisement. And, even faiths with such resources may not choose to have a Yellow Pages advertisement. For example, there is at least one Hindu Temple, one Bahai Assembly, and one Buddist [sic] congregation in Cobb County, yet none appear in the sections of the Yellow Pages.... None of these houses of worship have been represented at the Planning Commission meeting, perhaps because of the Commissions['] mechanism for inviting clergy.

(*See* Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 15 n. 6.) Even accepting the logic of Plaintiffs' argument, the Court struggles to discern how it is germane to the instant analysis.

Contrary to what Plaintiffs suggest in their papers, "diversity" among the faiths represented at legislative functions has never been the *sine qua non* of constitutional legitimacy. *See Marsh,* 463 U.S. at 793–94, 103 S.Ct. 3330 (rejecting argument that sixteen year tenure of Presbytrian minister was offensive to Establishment Clause); *see also* Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 17 n. 9 ("the current practice does not achieve the diversity required by the Court or claimed by the Defendants"). To be sure, it may lend support to a finding that a particular invocation practice has not crossed the boundaries erected by *Marsh* and (insofar as it proscribes the appearance of affiliation) *Allegheny.* But *Marsh,* as the Court reads it, was never intended to serve as a vehicle for challenging selection procedures on the basis of "disparate impact." Absent evidence that the phonebook was purposefully used as a device for stifling diversity, the Court discerns nothing troubling about selection procedures that rely, in whole or in part, on the Yellow Pages.

■ Although a slightly closer case, moreover, the Court does not find Commissioner Tim Lee and Planning Commissioner Bob Ott's failure to pass along Mr. Selman's list of potential speakers, local religious organizations, and, in some cases, bare identifications of select faiths (and non-faiths) indicative of an "improper motive." The record to which this Court has been directed is bereft of evidence which would illuminate the motivations, if any, behind Mr. Ott's apparent failure to provide that list to Ms. Richardson. Moreover, the evidence strongly suggests that Mr. Lee's decision not to pass the information along was the consequence of his unfamiliarity with the Board's process for selecting invocational speakers, and, to a

lesser degree, his misunderstanding as it related to the nature of Mr. Selman's objection.

What is more, it does not appear, in any event, that it was the practice of either the Board or the Planning Commission to accept suggestions from members of the public respecting whom to invite to provide invocational prayers. Messrs. Lee and Ott's failure to depart from that practice in the instant case does not lead the Court to find that their inaction was the product of any "improper motive" as that term was used in *Marsh*.

That brings the Court to the varied selection procedures employed by the Board and the Planning Commission. Based on the materials in the record, the Court finds no constitutional violation as to the Board, but concludes that the practices employed by the Planning Commission, at least during 2003–04, transgress the boundaries established by *Marsh*.

 First analyzing the practices employed by Ms. Martin on behalf of the Board, the Court recognizes that certain faiths were not represented on her "Master List," notwithstanding being identified in papers contained in her files (from which she admittedly extracted other contact information). At least three factors, however, lead the Court to reject an inference that such omissions were the product of an improper motive—*i.e.*, predicated on a potential speaker's sectarian affiliation or religious beliefs. *See Marsh*, 463 U.S. at 793, 103 S.Ct. 3330; *Pelphrey*, 410 F.Supp.2d at 1336.

Initially, the faiths that *are* included on Ms. Martin's Master List are quite diverse. Alongside denominationally and culturally heterogeneous Christian organizations, she lists three synagogues, one Unitarian Universalist congregation, and the County's only mosque. The inclusion of such organizations militates strongly against a finding that Ms. Martin's omission of other non-Christian or "non-traditional" [15] Christian organizations was calculated to exclude those religious leaders on the basis of their non-adherence to (traditional) Christian teachings.

Second, while Ms. Martin admits not recalling precisely why she omitted certain organizations from her Master List, she has provided credible explanations (oftentimes corroborated by documentary evidence) for those omissions, and these explanations do not evince an improper motive to engage in discrimination on the basis of the content of any given faith.

For example, Ms. Martin testified that she was informed by her predecessor that religious leaders belonging to the Jehovah's Witness and Mormon denominations declined to provide invocations on the basis of their religious beliefs, indicating that extending any further invitations to those organizations would be futile. What is more, her notes indicate that she may have nevertheless intended to contact such organizations again to inquire about their interest in participating in the Board's invocation opportunity.

Likewise, though she does not include a Baha'i assembly on the Master List, she offered her belief that the mark by the assembly on her papers may have indicated that she intended to contact the organization. Indeed, her notes reflect that she updated the address of the assembly, which would be inconsistent with a determination to exclude the organization from the invocation opportunity, whether on the basis of its adherence to the Baha'i faith or otherwise.

---

**15.** This is the term used by Plaintiffs to describe both Mormons and Jehovah's Witnesses.

Third, there is the unequivocal deposition testimony Ms. Martin offered, in which she not only denied excluding any religious group on the basis of their beliefs, but disclaimed any understanding of the beliefs held by many of the organizations Plaintiffs now accuse her of improperly excluding from her Master List:

Q: Have you ever removed someone from the list or decided not to place them on the list because of how they worship or what they believe in?

A: No.

Q: Do you know, have any knowledge yourself, of what Jehovah's Witnesses do or don't believe in?

A: No.

Q: How about Seventh Day Adventists?

A: No.

Q: How about Church of Latter–Day Saints?

A: No.

Q: Did their belief structures, their manner of praying, anything like that, have anything to do with why they don't appear on your list?

A: No.

(*See* Martin Dep. at 81.)

In light of the foregoing, the Court finds the evidence insufficient to sustain a finding of improper motive in connection with the selection of religious leaders to participate in the Board's invocation opportunity. The same is not true, however, as it relates to the Planning Commission.

■ It appears that Ms. Richardson's practice, at least during 2003–04, was to select religious leaders from a phonebook.

As mentioned previously, the Court finds nothing inherently problematic in using a phonebook as a tool to identify potential invocational speakers. But it appears from the record before the Court that certain faiths were categorically excluded from the list of prospective speakers based on the content of their faith. Indeed, the same type of line that excludes Chiropractors, Cigar & Cigarette Accessories dealers, and Circuit Board Assembly repair persons from the prayer opportunity also excludes Churches–Islamic, Churches–Jehovah's Witnesses, Churches–Jewish, and Churches–Latter Day Saints.

What is more, the Court does not credit the explanation that the long, continuous mark was used simply to identify those organizations with whom Ms. Richardson "had some contact at some point and [the offer to provide the invocation] generally was refused." (Richardson Dep. at 13.) As it relates to other, "traditional" Christian faiths, a leader's disinclination to provide the invocation on a particular occasion would result in a single mark or strike-through being placed next to his or her *particular* organization. It was never the case that a religious group was wholly excluded based on a single church's decision to decline the invitation to provide the opening prayer. In contrast, Ms. Richardson concedes that she did not contact, *e.g.,* every Jehovah's Witness congregation listed in the phonebook before striking the entire faith from consideration for future invocation opportunities. (*See* Richardson Dep. at 11–15, 17–18.) In the view of this Court, not even "the spacious boundaries set forth in *Marsh* [,]" *Simpson,* 404 F.3d at 284, can accommodate a practice that categorically excludes these faiths from the invocation opportunity on the basis of their religious identity.[16]

---

**16.** The Court acknowledges that at least one court has held that a government body may constitutionally restrict the "pool" from which it draws prospective speakers to "monotheistic congregations[.]" *See Simpson,* 404 F.3d at 284–87. This Court does not have such a restriction before it, and expresses no opinion as to whether *Simpson* was correctly decided in that regard.

To be sure, Ms. Richardson's practice, even before she was shifted out of the position of deputy clerk, had changed. In the 2005 copy of the Yellow Pages, no such line removes, *e.g.*, the County's synagogues and its mosque from consideration, and it appears from the record that such organizations have now been extended invitations to offer invocations at Planning Commission meetings. But, it is well-established that "a defendant's voluntary cessation of a challenged practice does not deprive the federal courts of power to determine the legality of the practice." *See Ala. v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1131 (11th Cir.2005). Rather, "[v]oluntary cessation of a challenged practice will only moot a case if 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Here, the Court finds no such clarity, and accordingly holds that Plaintiffs are entitled to judgment in their favor insofar as they challenge the selection procedures employed by the Cobb County Planning Commission.

### III. Appropriate Relief

The parties, in their papers, concern themselves primarily with the issue of the constitutionality of the Commissions' invocation practices. They do not address the issue of appropriate relief. Consequently, the parties are directed, within twenty (20) days from the date appearing on this Order, to submit filings addressing: (i) the appropriate scope of any injunctive relief; (ii) which Defendant(s) should be made subject to an injunction, and which, if any, should be held liable for nominal damages, costs, and or fees; and (iii) what measure of nominal damages, costs, and or fees, if any, should be taxed against Defendants. Each party shall be permitted eleven (11) days thereafter within which to respond to their opponents' filing.

### Conclusion

In accordance with the June 8, 2006 Consent Order [37], the parties' dispositive motions [49 & 52] are **GRANTED in part and DENIED in part.** Plaintiffs have demonstrated that the clergy selection procedures employed by the Cobb County Planning Commission are violative of the Establish Clause as interpreted in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). In all other respects, the Court finds the practices challenged by Plaintiffs to withstand constitutional scrutiny.

The parties are **DIRECTED,** within twenty (20) days from the date appearing on this Order, to submit filings addressing: (i) the appropriate scope of injunctive relief; (ii) which Defendant(s) should be made subject to an injunction, and which, if any, should be held liable for nominal damages, costs, and or fees; and (iii) what measure of nominal damages, costs, and or fees, if any, should be taxed against Defendants. Each party shall be permitted eleven (11) days thereafter within which to respond to their opponents' filing.

**SO ORDERED** this *8th* day of September, 2006.