[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 28, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-13611

_____

D. C. Docket No. 05-02075-CV-RWS-1

GARY PELPHREY,
a.k.a. Bats,
EDWARD BUCKNER,
ROBERTO MORAES,
JEFFREY SELMAN,
ROBERTA GOLDBERG,
a.k.a. Bobbi,
MARIE SHOCKLEY,

Plaintiffs-Appellants-
Cross-Appellees,

WESLEY CROWE,

Plaintiff,

versus

COBB COUNTY, GEORGIA,
SAM OLENS,
in his official capacity as Chairman of the
Cobb County Commission and in his individual
capacity,
MURRAY HOMAN,
in his official capacity as Chairman of the
Cobb County Planning Commission and in his
individual capacity,

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(October 28, 2008)**

Before WILSON and PRYOR, Circuit Judges, and MIDDLEBROOKS,[*] District
Judge.

PRYOR, Circuit Judge:

The key issue in this appeal is whether the practice of two county

commissions that allow volunteer leaders of different religions, on a rotating basis,

to offer invocations with a variety of religious expressions violates the

Establishment Clause. Both the Cobb County Commission and the Cobb County

Planning Commission have a long tradition of opening their meetings with a prayer

offered by volunteer clergy or other members of the community. The clergy have

represented a variety of faiths, including Christianity, Islam, Unitarian

Universalism, and Judaism, and their diverse prayers have, at times, included

expressions of their religious faiths. Those expressions ordinarily have been brief

_____

[*] Honorable Donald M. Middlebrooks, United States District Judge for the Southern
District of Florida, sitting by designation.

and often have occurred in the concluding phrase of the prayers. The prayers have included references to "Jesus," "Allah," "God of Abraham, Isaac, and Jacob," "Mohammed," and "Heavenly Father." Seven Cobb County taxpayers filed suit to enjoin the prayers.

The taxpayers argue that the Establishment Clause permits only nonsectarian prayers for the meetings of the commissions, but we disagree. Marsh v. Chambers makes clear that "[t]he content of the prayer is not of concern to judges where . . . there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." 463 U.S. 783, 794–95, 103 S. Ct. 3330, 3337–38 (1983). The district court applied this standard, found that the practice of the County Commission had not been exploitive, and refused to parse the content of the prayers. The district court also found that the practice of the Planning Commission had been exploitive during 2003 and 2004 and declared that practice unconstitutional. Because there is no clear error in either finding by the district court, we refuse "to embark on a sensitive evaluation or to parse the content of a particular prayer." Id. at 795, 103 S. Ct. at 3338. Whether invocations of "Lord of Lords" or "the God of Abraham, Issac, and Mohammed" are "sectarian" is best left to theologians, not courts of law. We affirm.

## I. BACKGROUND

3

The Cobb County Commission and the Cobb County Planning Commission have a long tradition of opening their meetings with prayer by volunteer clergy invited by County personnel on a rotating basis. The prayers are offered by clergy of a variety of faiths, including Christian, Jewish, Unitarian Universalist, and Muslim. The majority of the speakers are Christian, and the commissions assert that this presence reflects the composition of the religious institutions in Cobb County. The taxpayers contend that, between 1998 and 2005, 96.6 percent of the clergy, to the extent their faith was discernable, were Christian. During the same period, adherents to the Jewish, Unitarian Universalist, Muslim, and Baha'i faiths also provided invocations.

The commissions do not compose or censor the prayers. Over the past decade, 70 percent of prayers before the County Commission and 68 percent of prayers before the Planning Commission contained Christian references. Often the prayers ended with references to "our Heavenly Father" or "in Jesus' name we pray." Prayers also contained occasional references to the Jewish and Muslim faiths, such as references to Passover, Hebrew prayers, Allah, and Mohammed. Many prayers lacked what the taxpayers identify as sectarian references.

The commissions do not compensate those invited to pray, but the County expends municipal funds, in the form of materials and personnel time, to select,

4

invite, and thank the invocational speakers. The County Commission employs an administrative specialist, and the Planning Commission employs a deputy clerk to select the clergy. Both employees have autonomy in the selection of speakers, and each has used a different method for selection.

Beverly Martin, the administrative specialist of the County Commission, compiles a list of religious organizations in Cobb County from several sources, including the Yellow Pages, the internet, and business cards. The list is organized by denomination or faith and then by individual congregations. A majority of the congregations on the list are Christian. Martin randomly selects the speaker and avoids having speakers from the same religious group at consecutive meetings. Several congregations are in Martin's files, but are not included on the list. Other congregations are not included in Martin's files, but these congregations do not appear in the Yellow Pages. Martin testified that she does not take into account the beliefs held by a religious group when deciding whom to include on her list.

Sandra Richardson served as the deputy clerk of the Planning Commission and applied a different method for selection of clergy that relied primarily on her copy of the Yellow Pages. She has also relied on clergy who volunteer as part of the chaplain program for the police and fire departments. A copy of the phone book used by Richardson during 2003–2004 shows a dark, continuous line drawn

5

through the categories surrounding the "Churches" category in the Yellow Pages. The line crosses through the "Chiropractors," "Church Furnishings," and "Church Supplies" categories, among others. There is a similar, lighter line drawn through several subcategories of churches: "Churches-Islamic," "Churches-Jehovah's Witnesses," "Churches-Jewish," and "Churches-Latter Day Saints." No clergy from those subcategories were asked to provide the invocation during 2003–2004. Richardson's Yellow Pages for 2005 does not have similar notations, and Richardson contacted both a mosque and a synagogue that year.

These practices later changed. After the commencement of this action, the County consolidated the selection procedures of the Planning Commission and the County Commission. Both commissions now use a master list to select randomly a speaker to offer the prayer at a meeting.

Gary "Bats" Pelphrey, Edward Buckner, Roberto Moraes, Wesley Crowe, Jeffrey Selman, Roberta "Bobbi" Goldberg, and Marie Shockley are taxpayers of Cobb County who have attended meetings of the County Commission and Planning Commission and have witnessed the invocations that begin each meeting. The taxpayers complained to the commissions about the invocation practice, and Selman provided a list of several other potential speakers to Commissioner Tim Lee and Planning Commissioner Bob Ott. Neither commissioner provided this list

to administrative personnel.

The commissions also received a request from the American Civil Liberties Union to remove all "sectarian" references from the invocations. The commissions refused to comply with the request, and this lawsuit ensued. In their complaint, the taxpayers objected to sectarian prayers at commission meetings as unconstitutional and asked the district court to enjoin the practice.

The district court issued three orders about the merits of this controversy. The district court first denied the taxpayers' motion for a preliminary injunction. The court later entered findings of fact and conclusions of law and denied the taxpayers' request for a permanent injunction. The district court upheld the invocations of the County Commission. The district court ruled that the Planning Commission violated the Establishment Clause in 2003 and 2004 because of its selection procedure, but the court upheld the remaining invocations. In a third order, the district court held that the taxpayers had standing to challenge the selection procedures used by the Planning Commission in 2003–2004 and awarded them nominal damages. Both parties appealed. Crowe was dismissed from the action during the pendency of this appeal.

## II. STANDARDS OF REVIEW

We review <u>de novo</u> the legal conclusions of the district court. <u>Johnson v.</u>

<u>Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 507 (11th Cir. 2000). Because the parties consented to resolution of the factual issues by the district court, factual findings are reviewed for clear error. Fed. R. Civ. P. 52(a). "[A]s we have explained, '[w]e cannot hold a district court's finding of fact clearly erroneous unless, in view of the entire record, we are left with a definite and firm conviction that a mistake has been committed.'" <u>Glassroth v. Moore</u>, 335 F.3d 1282, 1291 (11th Cir. 2003) (quoting <u>Eng'g Contractors Ass'n v. Metropolitan Dade County</u>, 122 F.3d 895, 904 (11th Cir. 1997) (internal quotation marks omitted)).

### III. DISCUSSION

The Establishment Clause, which applies to the states through the Fourteenth Amendment, provides that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. Amend. I; <u>Everson v. Bd. of Educ.</u>, 330 U.S. 1, 15, 67 S. Ct. 504, 511 (1947). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." <u>Larson v. Valente</u>, 456 U.S. 228, 244, 102 S. Ct. 1673, 1683 (1982). "Establishment Clause challenges are not decided by bright-line rules, but on a case-by-case basis with the result turning on the specific facts." <u>Glassroth</u>, 335 F.3d at 1288 (citation omitted).

"[T]he inquiry calls for line-drawing; no fixed, per se rule can be framed." Lynch v. Donnelly, 465 U.S. 668, 678, 104 S. Ct. 1355, 1362 (1984).

Our discussion of the facts found by the district court and the issues in this appeal is divided into three parts. We first review the jurisprudence that governs legislative prayer. Second, we review for clear error the findings of the district court in support of its judgment that the practices of the County do not violate the Establishment Clause. Third, we turn to the arguments of the Planning Commission that the taxpayers lacked standing to complain about its practice in 2003 and 2004 and that the finding by the district court about that practice is clearly erroneous.

### A. The Establishment Clause Permits Legislative Prayer Not Exploited To Advance or Disparage Religion.

Our "delicate and fact-sensitive" inquiry is evident in the area of legislative prayer, which the Supreme Court, in Marsh, 463 U.S. 783, 103 S. Ct. 3330, excepted from the traditional analysis under the Establishment Clause. See Lee v. Weisman, 505 U.S. 577, 597, 112 S. Ct. 2649, 2660–61 (1992). Marsh involved a challenge to invocations offered by a state-employed chaplain at the beginning of each session of the Nebraska Legislature. 463 U.S. at 784, 103 S. Ct. at 3332. The Court of Appeals for the Eighth Circuit had applied the three-part inquiry from Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105 (1971), and concluded that the

9

invocations violated the Establishment Clause.  <u>Marsh</u>, 463 U.S. at 786, 103 S. Ct. at 3333.  The Supreme Court reversed and, without applying <u>Lemon</u>, upheld the Nebraska legislative prayer practice as an act that was "deeply embedded in the history and tradition of this country" that had not "been exploited to proselytize[,] . . . advance[,] . . . or . . . disparage any . . . faith or belief."  <u>Id.</u> at 786, 794–95, 103 S. Ct. at 3333, 3338.

The Court recounted the history of legislative prayer, which began with the decision of the Continental Congress to "open[] its sessions with a prayer offered by a paid chaplain" and "continued without interruption ever since [the first] session of Congress."  <u>Id.</u> at 787–88, 103 S. Ct. at 3333–34.  The Court explained that, in the days after Congress approved paid chaplains for the Senate and House of Representatives, the Founding Fathers reached a final agreement on the language of the Bill of Rights.  <u>Id.</u> at 788, 103 S. Ct. at 3334.  In the light of this history, the Court concluded that "[c]learly the men who wrote the First Amendment Religion Clauses did not view paid legislative chaplains and opening prayers as a violation of that Amendment."  <u>Id.</u>  Based on that "unambiguous and unbroken history of more than 200 years," the Court ruled that the practice of legislative prayer "[t]o invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a

step toward establishment . . . ." Id. at 792, 103 S. Ct. at 3336.

The Court examined the practice of the Nebraska Legislature and determined that the use of a chaplain of one denomination did not violate the Establishment Clause. That chaplain held the position for sixteen years, was paid out of public funds, and offered prayers in the "Judeo-Christian tradition." Id. at 793, 103 S. Ct. at 3337. The Court discussed the lengthy tenure of the chaplain and held, "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive, . . . long tenure does not in itself conflict with the Establishment Clause." Id. at 793–94, 103 S. Ct. at 3337. The Court also ruled the payment of the chaplain out of public funds did not violate the First Amendment. Id. at 794, 103 S. Ct. at 3337.

The Court then turned to the prayers in the Judeo-Christian tradition and refused to evaluate their content because the prayers had not been exploited to advance or disparage any religion:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

Id. at 794–95, 103 S. Ct. at 3337–38. The Court concluded that, when "[w]eighed against the historical background, these factors [the identity and selection of the chaplain and the Judeo-Christian nature of the prayers] do not serve to invalidate

11

Nebraska's [legislative prayer] practice." Id. at 793, 103 S. Ct. at 3337.

Since Marsh, the Supreme Court has provided guidance as to the permissible boundaries of legislative prayer in County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 109 S. Ct. 3086 (1989), and Lee, 505 U.S. 577, 112 S. Ct. 2649. Allegheny prohibited the display of religious symbols in public buildings that had "the purpose or effect of 'endorsing'" a particular faith. 492 U.S. at 592, 597, 109 S. Ct. at 3100, 3103. Lee restricted the role of the government in determining the content of prayer. 505 U.S. at 588–89, 112 S. Ct. at 2656. Both Allegheny and Lee provide insight about the boundaries for legislative prayer.

In Allegheny, the Supreme Court judged the "unique circumstances" of the appeal and concluded that the display of a creche in a public building had the "effect of promoting or endorsing religious beliefs" and violated the Establishment Clause, although the display of a menorah did not. Allegheny, 492 U.S. at 595–602, 620–21, 109 S. Ct. at 3102–05, 3115. Justice Kennedy dissented because he could not "comprehend" how the creche was unconstitutional when the legislative prayers upheld in Marsh were constitutional. Id. at 665, 109 S. Ct. at 3139 (Kennedy, J., dissenting). He urged the application of the Marsh standard to other religious practices and displays and suggested "the meaning of the

12

[Establishment] Clause is to be determined by reference to historical practices and understandings." Id. at 670, 109 S. Ct. at 3142.

In response to Justice Kennedy's dissent, the majority distinguished Marsh as applying to legislative prayer and refused to extend the historical reasoning of Marsh to other religious practices. Id. at 602–13, 109 S. Ct. at 3106–11 (majority opinion). The Court reiterated the fact-specific nature of its review under the Establishment Clause. Id. at 602–03, 109 S. Ct. at 3106. The Court stated that Marsh recognized that "legislative prayers that have the effect of affiliating the government with any one specific faith or belief" violate the Establishment Clause. Id. at 603, 109 S. Ct. at 3106 (citation omitted).

The Court explained that history could not "legitimate practices that demonstrate the government's allegiance to a particular sect or creed," even though history "may affect the constitutionality of nonsectarian references to religion by the government . . . ." Id. at 603, 109 S. Ct. at 3106. Marsh was consistent with this principle because it upheld a practice that did not tend to establish religion:

> Marsh itself . . . recognized that not even the "unique history" of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. The legislative prayers involved in Marsh did not violate this principle because the particular chaplain had "removed all references to Christ."

Id. (citations omitted). The Court concluded that "Marsh plainly does not stand for

13

the sweeping proposition Justice Kennedy apparently would ascribe to it, namely, that all accepted practices 200 years old and their equivalents are constitutional today." Id.

In Lee, the Court clarified that the government ordinarily should have no role in determining the content of public prayers. Public school officials had asked a rabbi to provide a "nonsectarian" invocation at a graduation ceremony. Lee, 505 U.S. at 581, 112 S. Ct. at 2652. The Court held that even that "nonsectarian" prayer violated the Establishment Clause. Id. at 599, 112 S. Ct. at 2661. The Court ruled that the principal should not have provided the rabbi with guidelines for the invocation and "directed and controlled the content of the prayers." Id. at 588, 112 S. Ct. at 2656. "It is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government' . . . ." Id. (quoting Engel v. Vitale, 370 U.S. 421, 425, 82 S. Ct. 1261, 1264 (1962)).

Marsh, as informed by Allegheny and Lee, controls our review of the constitutionality of legislative prayers. The district court concluded that these decisions direct us not to inquire into the content of prayers for "legislative and other deliberative public bodies" unless "the prayer opportunity has been

14

exploited" to advance or disparage a belief, Marsh, 463 U.S. at 786, 794, 103 S. Ct. at 3333, 3338, or affiliated the government with a specific faith, Allegheny, 492 U.S. at 603, 109 S. Ct. at 3106. We agree.

The taxpayers argue that Marsh permits only "nonsectarian" prayers for commission meetings, but their reading is contrary to the command of Marsh that courts are not to evaluate the content of the prayers absent evidence of exploitation. The taxpayers rely on the acknowledgment by the Supreme Court in Marsh that the chaplain had "removed all references to Christ" after 1980 and offered "nonsectarian" prayers at the time of the challenge. Marsh, 463 U.S. at 793 n.14, 103 S. Ct. at 3337 n.14. The Court provided these descriptions of the prayers in a footnote, but the Court never held that the prayers in Marsh were constitutional because they were "nonsectarian." See id. Nor did the Court define that term. See id. To read Marsh as allowing only nonsectarian prayers is at odds with the clear directive by the Court that the content of a legislative prayer "is not of concern to judges where . . . there is no indication that the prayer opportunity has been exploited to proselytize or advance any one . . . faith or belief." Id. at 794–95, 103 S. Ct. at 3337–38.

The Marsh Court considered several factors to determine whether the legislative prayers had been exploited to advance one faith. The Court weighed the

15

chaplain's religious affiliation, his tenure, and the overall nature of his prayers. Id. at 792–95, 103 S. Ct. at 3336–38. The "nonsectarian" nature of the chaplain's prayers was one factor in this fact-intensive analysis; it did not form the basis for a bright-line rule.

The taxpayers argue that Allegheny requires us to read Marsh narrowly to permit only nonsectarian prayer, but they are wrong. Allegheny does not require that legislative prayer conform to the model in Marsh. Allegheny instead reiterates the lesson of Marsh that legislative prayers should not "demonstrate a [government] preference for one particular sect or creed . . . ." See Allegheny, 492 U.S. at 605, 109 S. Ct. at 3107. When legislative prayers do not "have the effect of affiliating the government with any one specific faith or belief," id. at 603, 109 S. Ct. at 3106 (citation omitted), "it is not for [the court] to embark on a sensitive evaluation or to parse the content of a particular prayer." Marsh, 463 U.S. at 795, 103 S. Ct. at 3338.

We would not know where to begin to demarcate the boundary between sectarian and nonsectarian expressions, and the taxpayers have been opaque in explaining that standard. Even the individual taxpayers cannot agree on which expressions are "sectarian." Bats, one of the taxpayers, testified that a prohibition of "sectarian" references would preclude the use of "father," "Allah," and

16

"Zoraster" but would allow "God" and "Jehovah." Selman, another taxpayer, testified, "[Y]ou can't say Jesus, . . . Jehovah, . . . [or] Wicca . . . ." Selman also deemed "lord or father" impermissible.

The taxpayers' counsel fared no better than his clients in providing a consistent and workable definition of sectarian expressions. In the district court, counsel for the taxpayers deemed "Heavenly Father" and "Lord" nonsectarian, even though his clients testified to the contrary. At the hearing for oral arguments before this Court, the taxpayers' counsel asserted two standards to determine when references are impermissibly "sectarian." Counsel for the taxpayers first stated, "It is sectarian when the . . . prayer has the effect of affiliating the government with one specific faith or belief," but he later described a reference as "sectarian" when it "invokes the name of a divinity . . . in which only one faith believes." Counsel had difficulty applying either standard to various religious expressions. When asked, for example, whether "King of kings" was sectarian, he replied, "King of kings may be a tough one. . . . It is arguably a reference to one God. . . . I think it is safe to conclude that it might not be sectarian."

The difficulty experienced by taxpayers' counsel is a glimpse of what county commissions, city councils, legislatures, and courts would encounter if we adopted the taxpayers' indeterminate standard. As the taxpayers' counsel conceded at oral

17

arguments, "the line is not completely bright between sectarian and nonsectarian."

On that score, we are in complete agreement with the taxpayers' counsel.

The taxpayers erroneously contend that several other circuits have read Marsh to permit only nonsectarian prayer. A review of the precedents of our sister circuits establishes that they have not reached a consensus on the permissibility of sectarian references in legislative prayers. Two of the circuits read Marsh as we do. The remaining four circuits have not reached a decision about sectarian references in legislative prayers.

The Fourth Circuit has not read Marsh to bar legislative prayers that contain a variety of religious expressions. In its first decision to address Marsh, the Fourth Circuit concluded that the prayers of a city council that contained references to "Jesus Christ" were inconsistent with Marsh because the prayers "contain[ed] explicit references to a deity in whose divinity only those of one faith believe." Wynne v. Town of Great Falls, S.C., 376 F.3d 292, 301 (4th Cir. 2004). The court understood Marsh and Allegheny, as we do, to "teach that a legislative body cannot . . . 'exploit' [a] prayer opportunity to 'affiliate' the Government with one specific faith or belief . . . ." Id. at 298.

In its second decision, the Fourth Circuit read Marsh, as we do, to allow a county to invite clergy from diverse faiths to offer "a wide variety of prayers" at

18

meetings of its governing body. Simpson v. Chesterfield County Bd. of Supervisors, 404 F.3d 276, 284 (4th Cir. 2005) (Wilkinson, J.). The prayers included "wide and embracive terms" such as "'Lord God, our creator,' 'giver and sustainer of life,' 'the God of Abraham, Isaac and Jacob,' 'the God of Abraham, of Moses, Jesus, and Mohammad,' 'Heavenly Father,' 'Lord our Governor,' 'mighty God,' 'Lord of Lords, King of Kings, creator of planet Earth and the universe and our own creator.'" Id. at 284. The court stated that "a practice would remain constitutionally unremarkable where 'there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" Id. at 283 (quoting Marsh, 463 U.S. at 794–95, 103 S. Ct. at 3338). The court distinguished Wynne on the ground that the prayers of the city council had been exploitive because their "pervasively and exclusively sectarian nature" had "undermined . . . participation by persons of all faiths in public life." Id.

The Simpson court praised the County for its practice of prayer being "in many ways more inclusive than that approved by the Marsh Court." Id. at 285. The County relied on voluntary clergy and "welcome[d] rabbis, imams, priests, pastors, and ministers" who represented "a wide cross-section of the County's religious leaders." Id. The court explained that invalidating a practice of prayer

19

more inclusive than that upheld in <u>Marsh</u> "would achieve a particularly perverse result"; a cramped reading of <u>Marsh</u> "would push localities intent on avoiding litigation to select only one minister from only one faith." <u>Id.</u> at 287. That consequence would make "America and its public events more insular and sectarian rather than less so." <u>Id.</u>

This year, Justice Sandra Day O'Connor, writing for the Fourth Circuit, read <u>Marsh</u> to allow invocations offered during meetings of a city council. <u>Turner v. City Council of City of Fredericksburg, Va.</u>, 534 F.3d 352, 356 (4th Cir. 2008). The city council permitted only nondenominational prayers at its meetings, and Turner, a member of the council who had not been allowed to offer a sectarian prayer, challenged that policy. <u>Id.</u> at 354. The Fourth Circuit upheld the policy and applied the same standard from <u>Marsh</u> that we apply today: "So long as the prayer is not used to advance a particular religion or to disparage another faith or belief, courts ought not to 'parse the content of a particular prayer.'" <u>Id.</u> at 356 (quoting <u>Marsh</u>, 463 U.S. at 795, 103 S. Ct. at 3338). Although it upheld the policy of the council, the Fourth Circuit expressly declined to hold that <u>Marsh</u> required a policy of nondenominational prayers: "We need not decide whether the Establishment Clause <u>compelled</u> the Council to adopt their legislative prayer policy, because the Establishment Clause does not absolutely dictate the form of

20

legislative prayer." Id. Because the invocations in Turner, like the invocations in Marsh, "recognized the rich religious heritage of our country in a fashion that was designed to include members of the community, rather than to proselytize[,]" Justice O'Connor wrote that they fell "squarely within the range of conduct permitted by Marsh and Simpson." Id. As the Fourth Circuit recognized, Marsh permits a range of prayers to be offered during local, state, or federal legislative meetings. Id.

The Tenth Circuit also has stated that Marsh does not categorically prohibit prayers that invoke "particular concept[s] of God." Snyder v. Murray City Corp., 159 F.3d 1227, 1233–34, 1234 n.10 (10th Cir. 1998) (en banc). The Tenth Circuit upheld the decision of a city council to deny a citizen's request to offer a prayer that "aggressively proselytize[d] for his particular religious views and strongly disparage[d] other religious views." Id. at 1235. The court read Marsh to hold that legislative prayer is unconstitutional "when 'the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" Id. at 1233–34 (quoting Marsh, 463 U.S. at 794–95, 103 S. Ct. 3338).

Contrary to the taxpayers' argument, the Fifth Circuit, the Seventh Circuit, and the Ninth Circuit have not decided the constitutionality of sectarian references in legislative prayers. The decision of the Fifth Circuit that the taxpayers cite, Doe

21

v. Tangipahoa Parish School Board (Doe I), 473 F.3d 188, 202–05 (5th Cir. 2006), was fractured, with the panel split three ways, and the en banc court vacated that decision, granted rehearing, and remanded with instructions to dismiss for lack of standing. Doe v. Tangipahoa Parish Sch. Bd. (Doe II), 494 F.3d 494 (5th Cir. 2007) (en banc). Although the Seventh Circuit initially stated that Marsh "hing[ed] on the nonsectarian" nature of the prayers and denied a request for a stay of an injunction against the practice of the Indiana Legislature, Hinrichs v. Bosma (Hinrichs I), 440 F.3d 393, 394–95, 399 (7th Cir. 2006), the Seventh Circuit later reversed that injunction and, like the Fifth Circuit in Doe II, remanded with instructions to dismiss for lack of standing. Hinrichs v. Speaker of the House of Representatives of the Ind. Gen. Assembly (Hinrichs II), 506 F.3d 584, 585 (7th Cir. 2007). The taxpayers also rely on Bacus v. Palo Verde Unified School District Board of Education, 52 Fed. Appx. 355 (9th Cir. 2002) (unpublished opinion), to suggest that the Ninth Circuit has prohibited sectarian references in legislative prayers, but Bacus is an unpublished decision that concerned prayers offered only "in the Name of Jesus" at the meetings of a school board. Id. at 356. The court stated that it "need not decide whether the prayers 'in the Name of Jesus' would be a permissible solemnization of a legislature-like body, provided that invocations were, as is traditional in Congress, rotated among leaders of different faiths, sects,

22

and denominations." Id.  As an unpublished opinion, Bacus has no precedential effect in the Ninth Circuit.  See Ninth Cir. R. 36-3.

The Sixth Circuit stated, in dicta, decades ago that Marsh permits only nonsectarian prayers, but that decision involved public school graduations, not legislative bodies.  Stein v. Plainwell Cmty. Sch., 822 F.2d 1406, 1409 (6th Cir. 1987).  The graduation ceremonies included invocations that "employ[ed] the language of Christian theology and prayer."  Id. at 1410.  The Supreme Court has since rejected the application of Marsh to prayer at public school graduations.  See Lee, 505 U.S. at 597, 112 S. Ct. at 2660–61.

Contrary to the taxpayers' argument, there is no clear consensus among our sister circuits about sectarian references in legislative prayer, but we read Marsh, as the Fourth Circuit and the Tenth Circuit do, to forbid judicial scrutiny of the content of prayers absent evidence that the legislative prayers have been exploited to advance or disparage a religion.  The taxpayers would have us parse legislative prayers for sectarian references even when the practice of legislative prayers has been far more inclusive than the practice upheld in Marsh.  We decline this role of "ecclesiastical arbiter," Marsh, 463 U.S. at 821, 103 S. Ct. at 3351 (Brennan, J., dissenting), for it "would achieve a particularly perverse result."  Simpson, 404 F.3d at 287.

23

*B. The Commissions Are Legislative Bodies Governed by <u>Marsh</u>.*

The prayers of the commissions are governed by <u>Marsh</u>. Contrary to the assertion of the dissent, we are not adopting a broad interpretation of <u>Marsh</u> that would "authorize prayer at virtually every government meeting." <u>Marsh</u> applies to legislative bodies. As the Supreme Court stated in <u>Marsh</u>, "[T]here can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment . . . ." <u>Marsh</u>, 463 U.S. at 792, 103 S. Ct. at 3336. The Cobb County Commission is "a public body entrusted with making the laws," <u>see</u> <u>id.</u>; Ga. Const. Art. IX, § II, ¶ I, and the Planning Commission is a creature of the Cobb County Commission that assists its work. <u>See</u> 2 <u>Acts and Resolutions of the General Assembly of the State of Georgia 1956</u>, at 2006–19; 2 <u>Acts and Resolutions of the General Assembly of the State of Georgia</u> 1974, at 3873–96.

The dissent argues, and we agree, that we should look to state law to determine whether each commission is a legislative body, but the dissent ignores the clear law of Georgia that county commissions are legislative bodies. The Constitution of Georgia, which is the ultimate touchstone, declares, "The governing authority of each county shall have <u>legislative</u> power . . . ." Ga. Const.

24

Art. IX, § II, ¶ I (emphasis added).  The Code of Georgia defines the "County

governing authority" as "the board of county commissioners, the sole county

commissioner, or the governing authority of a consolidated government."  Ga.

Code Ann. § 1-3-3.  The Code vests the commission with legislative powers

similar to those exercised by Congress and state legislatures:  the power to control

property, Ga. Code Ann. § 36-5-22.1(a)(1); levy general and special taxes, id. § 36-

5-22.1(a)(2); establish roads, id. § 36-5-22.1(a)(3); make rules and regulations for

the county, id. § 36-5-22.1(a)(8); and adopt a county budget, id. § 36-81-3.  Cf.

U.S. Const. Art. I, § 8; id. Art. IV, § 3; 2 U.S.C. § 642; Ga. Const. Art. III, § I, ¶ 1;

id. Art. III, § VI.

The dissent is unable to cite a single decision from this Court or a sister

circuit that supports the novel proposition that a local commission or council is not

a legislative body governed by Marsh.  Every other circuit that has considered the

permissibility of invocations by municipal councils and county commissions has

applied the Marsh standard.  Justice O'Connor, writing for the Fourth Circuit in

Turner, applied Marsh to a city council and stated, "The Council's decision to open

its legislative meetings with nondenominational prayers does not violate the

Establishment Clause."  534 F.3d at 356.  In Simpson, the Fourth Circuit ruled that

a county board of supervisors is a deliberative body governed by Marsh, 404 F.3d

25

at 278, and in <u>Snyder</u>, the Tenth Circuit applied <u>Marsh</u> to a city council. 159 F.3d at 1228. To our knowledge, no court has even suggested that <u>Marsh</u> does not apply to local legislative bodies, and neither the taxpayers nor the County advanced the argument that the commissions are not legislative bodies within the meaning of <u>Marsh</u> at any stage of this litigation.

The dissent would limit the application of <u>Marsh</u> to state and federal governments, but neither the Supreme Court nor this Court has ever applied to local governments standards different from the ordinary requirements of the Establishment Clause. <u>See</u> <u>McCreary County, Ky. v. ACLU of Ky.</u>, 545 U.S. 844, 125 S. Ct. 2722 (2005); <u>Allegheny</u>, 492 U.S. 573, 109 S. Ct. 3086; <u>King v. Richmond County, Ga.</u>, 331 F.3d 1271 (11th Cir. 2003). We instead have applied the precedents of the Supreme Court irrespective of the level of government involved. In <u>Glassroth</u>, a decision cited extensively by the dissent, this Court applied <u>Allegheny</u>, which involved a religious display at a county courthouse, to a religious monument in a state judicial building. 335 F.3d at 1294. We also cited with approval decisions of our sister circuits that addressed the presence of religious symbols in county courthouses and municipal buildings. <u>Id.</u> at 1300. The decisions of the Supreme Court have not applied varying standards based on the level of government, and we find no reason to adopt this artificial distinction now.

26

The dissent asserts that <u>Marsh</u> permits legislative prayer only when the invocations of the governing body are part of an "ancient . . . practice." The dissent refuses to apply <u>Marsh</u> to the commissions because they were established in 1964 and 1956 and do not "have a 'practice of over a century' of invocation prayers as did the Nebraska legislature" in <u>Marsh</u>. This reasoning is plainly wrong.

Nothing in <u>Marsh</u> suggests that the tolerance of legislative prayer, under the Establishment Clause, applies unequally to legislative bodies based on the date the legislative body was formally established. Based on the reasoning of the dissent, <u>Marsh</u> would permit the Boston city council, established in 1822, to engage in legislative prayer, Josiah Quincy, <u>A Municipal History of the Town and City of Boston, During Two Centuries</u> 32–33 (Boston, Charles C. Little & James Brown, 1852), but <u>Marsh</u> would forbid similar legislative prayers by the state legislature in Alaska, which achieved statehood in 1959. Claus-M. Naske & Herman E. Slotnick, <u>Alaska: A History of the 49th State</u> 166 (2d ed. 1994). <u>Marsh</u> does not require that absurd result.

The dissent misapplies decisions about prayer in public schools and religious monuments to support its argument that we should apply the test from <u>Lemon</u> instead of the standard established in <u>Marsh</u>, but the Supreme Court has rejected this reasoning. The Supreme Court has explained that its decisions on school

prayer are unique because "heightened concerns" are present in elementary and secondary public schools.  Lee, 505 U.S. at 592, 112 S. Ct. at 2658; Van Orden v. Perry, 545 U.S. 677, 691, 125 S. Ct. 2854, 2863–64 (2005) (plurality opinion). The Court has recognized that there are "[i]nherent differences" between public schools and legislative bodies.  Lee, 505 U.S. at 596, 112 S. Ct. at 2660.  As Justice O'Connor explained for the Fourth Circuit in Turner, "The Supreme Court of the United States has treated legislative prayer differently from prayer at school events . . . ."  534 F.3d at 356.  The same is true about decisions regarding religious monuments.  In Allegheny, the Supreme Court refused to apply the same test for a religious display that the Court applied to legislative prayer.  492 U.S. at 602–13, 109 S. Ct. at 3106–11.  For that reason, we too have distinguished between legislative prayers and religious monuments.  See Glassroth, 335 F.3d at 1297–98.

The dissent labels Marsh an "outlier" and contends that "the Supreme Court consistently has applied the Lemon test," but three years ago, the Supreme Court said otherwise: "Many of our recent decisions simply have not applied the Lemon test.  Others have applied it only after concluding that the challenged practice was invalid under a different Establishment Clause test."  Van Orden, 545 U.S. at 686, 125 S. Ct. at 2861 (internal citations omitted).  The dissent contends that the Supreme Court has never expanded the Marsh exception, but the Supreme Court,

28

in the last twenty-five years, also has not retreated from its decision in Marsh. Indeed, that decision was not the last time the Supreme Court considered historical practice to resolve a case under the Establishment Clause. In Van Orden, the Court stated that its decision to allow a monument of the Ten Commandments on state grounds was "driven both by the nature of the monument and by our Nation's history." Id. The Court then reiterated, "We have acknowledged . . . that 'religion has been closely identified with our history and government . . .'" Id. at 687, 125 S. Ct. at 2861–62 (quoting Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 212, 83 S. Ct. 1560, 1566 (1963)).

The dissent asserts that "it defies logic" to permit legislative prayer in the same building where a religious monument may be prohibited, but that line was drawn by the Supreme Court, not us. Compare Marsh, 463 U.S. 783, 103 S. Ct. 3330, with Allegheny, 492 U.S. 573, 109 S. Ct. 3086. Our application of precedents regarding the Establishment Clause requires "the exercise of legal judgment. That judgment is not a personal judgment." Van Orden, 545 U.S. at 700, 125 S. Ct. at 2869 (Breyer, J., concurring in the judgment) (citation omitted). We are bound to apply Marsh faithfully to "legislative and other deliberative public bodies." See Marsh, 463 U.S. at 786, 103 S. Ct. at 3333.

C. *The District Court Did Not Clearly Err When It Found that the Prayers of the County Commission Did Not Advance or Disparage a Religion.*

In a series of thorough, meticulous, and well-reasoned orders, the district court evaluated the prayers of each commission as a whole and considered three factors to determine whether the prayers had been exploited to affiliate the county with a particular faith: the identity of the invocational speakers, the selection procedures employed, and the nature of the prayers. Our main task is to evaluate whether the factual findings by the district court, which we review for clear error, are supported by the record. The district court found that the prayers of the county commission had not "'been exploited to proselytize or advance any one, or to disparage any other, faith or belief[,]'" or had "'the effect of affiliating the government with any one specific faith or belief.'" Pelphrey v. Cobb County, Ga., 448 F. Supp. 2d 1357, 1370 (N.D. Ga. 2006) (quoting Marsh, 463 U.S. at 794–95, 103 S. Ct. at 3338, and Allegheny, 492 U.S. at 603, 109 S. Ct. at 3106).

1.  The Findings that the Identity of the Speakers and the Nature of the Prayers Did Not Advance a Single Religion Are Not Clearly Erroneous.

The district court did not clearly err when it found that the County did not exploit the prayers to advance one faith by using predominantly Christian speakers. Although the majority of speakers were Christian, the parties agree that prayers were also offered by members of the Jewish, Unitarian, and Muslim faiths. This diversity of speakers, in contrast with the chaplain of one denomination allowed in Marsh, supports the finding that the County did not exploit the prayers to advance

30

any one religion.  The speakers, like those in <u>Simpson</u>, represented "a wide cross-section of the County's religious leaders."  <u>Simpson</u>, 404 F.3d at 285.

The finding that the diverse references in the prayers, viewed cumulatively, did not advance a single faith also was not clearly erroneous.  The prayers included references from Christianity and other faiths, which the district court found "tend[ed] to further militate against a finding that the Commissions' practices" had been exploited to affiliate the government with a particular faith.  <u>Pelphrey</u>, 448 F. Supp. 2d at 1370.  Most of the references were brief and occurred at the end of each prayer.  Some prayers included references to "Jesus Christ," but others referenced "Allah," "Mohammed," and the Torah.  Prayers included a variety of terms, such as "king of kings and lord of lords," "Heavenly Father," and "God of Abraham, Isaac, and Jacob, God of history, Lord of creation, Lord of love, our Father . . . ."  The diversity of the religious expressions, in contrast with the prayers in the Judeo-Christian tradition allowed in <u>Marsh</u>, supports the finding that the prayers, taken as a whole, did not advance any particular faith.

2.  The Finding that the Selection Process of the County Commission Was Not Based on an Impermissible Motive Is Not Clearly Erroneous.

The district court did not clearly err when it found that the procedures employed by the County Commission were not motivated by an improper motive.  <u>Pelphrey</u>, 448 F. Supp. 2d at 1373.  <u>Marsh</u> prohibited the selection of invocational

31

speakers based on an "impermissible motive" to prefer certain beliefs over others. 463 U.S. at 793–94, 103 S. Ct. at 3336–37.  The County Commission compiled the list of potential speakers from various sources and included diverse religious institutions, including a mosque and three synagogues.  Martin testified that she did not exclude religious institutions based on their beliefs, and the record establishes that, in many instances, Martin was unfamiliar with the beliefs of the institutions.

The district court also did not err by finding that the failure of two commissioners to forward a list of potential speakers prepared by Selman was not prompted by an "impermissible motive." Pelphrey, 448 F. Supp. 2d at 1370–72.  It was not the practice of the commissioners to make suggestions about the faiths represented on the list of potential speakers or particular invocational speakers, and at least one of the commissioners was unaware of who invited the invocational speakers.  Nothing in the record suggests any improper motive on the part of the commissioners, and the district court did not clearly err when it found this failure in communication did not rise to the level of an "impermissible motive."

3.  We Will Not Parse or Censor the Legislative Prayers.

Because there is no clear error in the findings that the prayers of the County Commission were not exploited to advance one faith or belief, we need not

32

evaluate the content of the prayers. The federal judiciary has no business in "'compos[ing] official prayers for any group of the American people to recite as a part of a religious program carried on by government . . . .'" Lee, 505 U.S. at 588, 112 S. Ct. at 2656 (quoting Engel v. Vitale, 370 U.S. at 425, 82 S. Ct. at 1264). We affirm the ruling of the district court that the prayers of the County Commission do not violate the Establishment Clause.

*D. The District Court Did Not Err When It Ruled that the Prayers of the Planning Commission in 2003 and 2004 Were Unconstitutional.*

The district court applied the same analysis to the prayers of the Planning Commission during 2003 and 2004 and concluded that those prayers were unconstitutional based on the selection procedures. The district court found that two of the practices of the Planning Commission – the identity of speakers and content of the prayers – mirrored the practices of the County Commission and, as previously discussed, did not run afoul of the Constitution. The district court determined that the third factor – the selection process employed by the Planning Commission – violated the Establishment Clause during 2003 and 2004 because it "categorically excluded" certain faiths. Pelphrey, 448 F. Supp. 2d at 1373.

The Planning Commission argues that the taxpayers lack standing to challenge the prayers that occurred in 2003 and 2004, and, alternatively, the finding of the district court is clearly erroneous. We disagree on both counts. We

33

conclude that the taxpayers have both traditional standing under Article III and taxpayer standing. We also conclude that the finding of the district court is supported by the record and is not clearly erroneous.

1. The Taxpayers Have Standing To Challenge the Practice of the Planning Commission During 2003–2004.

The taxpayers have both traditional and taxpayer standing to challenge the constitutionality of the prayer practice of the Planning Commission. The issue of standing is a "threshold one" that we review de novo. Glassroth, 335 F.3d at 1291–92. The three elements of standing – injury, traceability, and redressability – are well-settled:

> To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.

Bennett v. Spear, 520 U.S. 154, 162, 117 S. Ct. 1154, 1161 (1997); Glassroth, 335 F.3d at 1292. The district court held that the taxpayers satisfied the requirements for both traditional and taxpayer standing. The parties dispute whether the taxpayers suffered an "injury in fact."

a. The Taxpayers Have Standing Under Article III Based on Their Direct Contact with the Offensive Practice.

Traditional standing under Article III for Establishment Clause claims based

34

on non-economic harms requires the plaintiffs to "identify 'a personal injury suffered by them as a consequence of the alleged constitutional error.'" Glassroth, 335 F.3d at 1292 (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 485, 102 S. Ct. 752, 765 (1982)) (emphasis omitted). An actual injury occurs if the plaintiff is "subjected to unwelcome religious statements" and is "'directly affected by the laws and practices against [which his or her] complaints are directed.'" Saladin v. City of Milledgeville, 812 F.2d 687, 692 (11th Cir. 1987) (quoting Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. at 224 n.9, 83 S. Ct. at 1572 n.9). In Saladin, several citizens challenged the constitutionality of a city seal that included the word "Christianity." 812 F.2d at 688–89. This Court concluded that the plaintiffs' "direct contact with the offensive conduct" of the City through the receipt of stationery bearing the seal was a sufficient injury for standing. Id. at 692–93.

Selman, one of the taxpayers, suffered a personal injury sufficient to confer standing because he had direct contact with the practice of the Planning Commission during 2003–2004. The district court found that Selman attended three Planning Commission meetings in person and viewed additional Planning Commission meetings via the internet, during which invocations were given. The record confirms that Selman attended his first County Commission meeting in

35

February 2003, and since then, he has attended three Planning Commission meetings and has witnessed the invocation at each. He has also watched numerous meetings of the Planning Commission on the internet since 2003. Because the record allows an inference that Selman observed a meeting of the Planning Commission in 2003 or 2004, the district court did not clearly err when it found that Selman had direct contact with the offensive invocational practices of the Planning Commission. This contact is sufficient to establish the personal and individualized injury necessary for standing. Because one plaintiff has standing, we need not consider whether the other plaintiffs had sufficient contact with the offensive practice to establish standing. Glassroth, 335 F.3d at 1293.

b. The Taxpayers Have Standing Based on Their Status as Municipal Taxpayers.

The taxpayers also have standing as municipal taxpayers to challenge the prayers of the Planning Commission during 2003–2004. In the seminal decision on taxpayer standing, Frothingham v. Mellon, the Supreme Court rejected, as a general proposition, the standing of federal taxpayers to challenge federal statutes as unconstitutional, but the Court distinguished challenges by municipal taxpayers. 262 U.S. 447, 486, 43 S. Ct. 597, 600–01 (1923). "The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a

36

large number of state cases and is the rule of this Court." Id.

The Supreme Court later relaxed the Frothingham standard and ruled that federal taxpayers had standing to challenge the constitutionality of a federal spending program under the Spending Clause if the expenditure violated a specific constitutional limitation. Flast v. Cohen, 392 U.S. 83, 102–03, 88 S. Ct. 1942, 1953–54 (1968). The Flast exception remains narrow and limits standing by federal taxpayers to challenges aimed at a "specific congressional appropriation" that violates the Establishment Clause. Hein v. Freedom From Religion Found., Inc., 127 S. Ct. 2553, 2559, 2565–66 (2007). The district court relied on Flast to conclude that the taxpayers had standing as municipal taxpayers, but this reliance was misplaced. Flast pertains only to federal taxpayers and does not apply to municipal taxpayers.

The standing of municipal taxpayers to challenge, as unconstitutional, expenditures by local governments remains settled law. The Supreme Court recently restated the distinction between standing of municipal taxpayers and standing of federal or state taxpayers. "The Frothingham Court noted with approval the standing of municipal residents to enjoin the 'illegal use of the moneys of a municipal corporation,' relying on 'the peculiar relation of the corporate taxpayer to the corporation' to distinguish such a case from the general

37

bar on taxpayer suits." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 349, 126 S. Ct. 1854, 1865 (2006) (quoting Frothingham, 262 U.S. at 486–87, 43 S. Ct. at 601). The Court then rejected the Cuno plaintiffs' attempts "to leverage the notion of municipal taxpayer standing beyond challenges to municipal action . . . ." Id. Municipal taxpayers have standing to challenge unconstitutional expenditures if their interest is "direct and immediate." Frothingham, 262 U.S. at 486, 43 S. Ct. at 601.

A municipal taxpayer has standing to challenge a violation of the Establishment Clause by a municipality when the taxpayer is a resident who can establish that tax expenditures were used for the offensive practice. See Doe v. Duncanville Indep. Sch. Dist., 70 F.3d 402, 408 (5th Cir. 1995); BATS v. Cobb County, Ga., 495 F. Supp. 2d 1311, 1317 (N.D. Ga. 2007); Harvey v. Cobb County, Ga., 811 F. Supp. 669, 675 (N.D. Ga. 1993). Our sister circuits have also recognized the standing of municipal taxpayers to challenge unconstitutional expenditures and have applied similar standards. See Doe, 70 F.3d at 408; Rocks v. City of Philadelphia, 868 F.2d 644, 648 (3d Cir. 1989); Freedom From Religion Found., Inc. v. Zielke, 845 F.2d 1463, 1469–70 (7th Cir. 1988); Hawley v. City of Cleveland, 773 F.2d 736, 741–42 (6th Cir. 1985); Donnelly v. Lynch, 691 F.2d 1029, 1031–32 (1st Cir. 1982), rev'd on other grounds, 465 U.S. 668, 104 S. Ct.

1355 (1984). That standard applies here.

The municipal taxpayers have established the "direct and immediate" interest necessary to confer standing to challenge the constitutionality of the prayers of the Planning Commission. The record is clear, and the parties do not contest, that the taxpayers are residents and taxpayers of Cobb County, and the County expended public funds to select, invite, and thank invocational speakers for Planning Commission meetings during 2003–2004. We affirm the decision that the taxpayers have standing.

2. The Findings of the District Court About the Prayer Practice of the Planning Commission in 2003 and 2004 Were Not Clearly Erroneous.

The district court did not err when it ruled that the prayers of the Planning Commission during 2003–2004 were unconstitutional because the selection procedures violated the "impermissible motive" standard of <u>Marsh</u>. In <u>Marsh</u>, the Court stated that the selection of a chaplain for 16 years was not a violation of the Establishment Clause "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive . . . ." 463 U.S. at 793, 103 S. Ct. at 3337. The district court interpreted this language to prohibit the selection of a speaker based on the speaker's beliefs:

> [T]he "impermissible motive" prohibition seems directed at the conscious selection of a speaker from one denomination or sect for the purpose of promoting or endorsing the beliefs held by that speaker.

39

> That is, the Court appeared to deem constitutionally unacceptable the selection and retention of a particular speaker <u>because</u> of that speaker's sectarian affiliation or religious beliefs.

<u>Pelphrey v. Cobb County, Ga.</u>, 410 F. Supp. 2d 1324, 1336 (N.D. Ga. 2006).

The County argues that the district court erred in its application of the "impermissible motive" standard because it converts an "inquiry into 'motive' into a mandate that government treat all potential prayer-givers equally." We disagree. The district court faulted the Planning Commission for excluding certain faiths because of their beliefs. <u>Marsh</u> upheld the selection and tenure of the chaplain in the absence of evidence that his selection was based on his particular beliefs. 463 U.S. at 793–94, 103 S. Ct. at 3337. The "impermissible motive" standard does not require that all faiths be allowed the opportunity to pray. The standard instead prohibits purposeful discrimination. The district court recognized this distinction and applied the correct standard.

The County suggests that the selection process is immaterial when the content of the prayer is constitutional, but we again disagree. The central concern of <u>Marsh</u> is whether the prayers have been exploited to create an affiliation between the government and a particular belief or faith. <u>See Marsh</u>, 463 U.S. at 794–95, 103 S. Ct. at 3337–38; <u>Allegheny</u>, 492 U.S. at 603, 109 S. Ct. at 3106. The <u>Marsh</u> Court weighed all of the factors that comprised the practice, including

the nature of the prayers, the identity of the speaker, and the selection of the clergy. Marsh, 463 U.S. at 793–95, 103 S. Ct. at 3336–38. The district court correctly considered the selection process as a relevant factor.

The record supports the finding that Richardson "categorically excluded" certain faiths from the list of potential invocational speakers for meetings of the Planning Commission. The phone book used by Richardson to compile the list of potential speakers for 2003–2004 had a long and continuous line through certain categories of faiths, including "Churches-Islamic," "Churches-Jehovah's Witnesses," "Churches-Jewish," and "Churches-Latter Day Saints." The line that crossed through these religious categories was similar to the line drawn through other categories, such as "Chiropractors" and "Circuit Board Assembly Repairs," and there were no invocational speakers from these faiths at Planning Commission meetings in 2003 and 2004. The record supports the finding that Richardson categorically excluded certain faiths. The district court did not clearly err when it found that the Planning Commission categorically excluded specific faiths based on their beliefs, and we agree with the district court that the categorical exclusion of certain faiths based on their beliefs is unconstitutional.

3. The District Court Did Not Err When It Awarded Nominal Damages To Remedy the Constitutional Violations.

The district court did not err in its award of nominal damages. "Nominal

41

damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages."  Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003). This Court has found that "nominal damages are similarly appropriate in the context of a First Amendment violation."  KH Outdoor, L.L.C. v. Trussville, City of, 465 F.3d 1256, 1261 (11th Cir. 2006).  Because the taxpayers proved a constitutional violation, they are entitled to nominal damages.

## IV.  CONCLUSION

The judgment of the district court is

**AFFIRMED.**

MIDDLEBROOKS, District Judge, Dissenting:

I.

Justice Oliver Wendell Holmes wrote that he was not "troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law." Irwin v. Gavit, 268 U.S. 161, 167, 45 S.Ct. 475, 476 (1925). Our Establishment Clause jurisprudence is "of necessity one of line-drawing, of determining at what point a dissenter's rights of religious freedom are infringed by the State." Lee v. Weisman, 505 U.S. 577, 598, 112 S.Ct. 2649, 2661 (1992). While I agree with much of the majority opinion, particularly with respect to the danger of the federal judiciary embarking on the editing of prayer, I disagree that Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330 (1983) should be read so broadly as to authorize prayer at virtually every government meeting. Marsh has been viewed as an exception to the rule, justified only by a specific history. In this case, the majority allows the exception to swallow the rule. I respectfully dissent.

## II.

Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105 (1971) governs modern Establishment Clause jurisprudence, subjecting both laws and government practices to a three-part test to determine whether they are constitutional. See McCreary County, Ky. v. ACLU of Ky., 545 U.S. 844, 125 S.Ct. 2722 (2005); Glassroth v. Moore, 335 F.3d 1282 (11th Cir. 2003). For a law or practice to be

deemed constitutional, "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" Lemon, 403 U.S. at 612-13, 91 S.Ct. at 211 (internal citations omitted).

The prayer solicited and sponsored by the Cobb County commissions violates all three prongs of the Lemon test. It would be incredulous to argue any purpose other than a religious one for "invoking divine guidance" upon the commissions, and the parties do not allege any other purpose. It is equally axiomatic that the primary effect of the prayers is to advance religion. See Marsh, 463 U.S. at 797, 103 S.Ct. at 3339. The practice of praying at the commissions' sessions also constitutes excessive entanglement between the State and religion. Cobb County staff are charged with inviting local religious leaders to deliver the prayers, and as the District Court and the majority have affirmed, such a practice has been conducted in a discriminatory, unconstitutional way.

In concluding the Lemon opinion, Chief Justice Burger wrote for the majority: "[t]he Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn." Lemon, 403

U.S. at 625, 91 S.Ct. at 2117. Twelve years later, Chief Justice Burger found some

involvement and entanglement justified. In Marsh, a Nebraska legislator

challenged the Nebraska Legislature's practice of beginning each of its sessions

with a prayer offered by a chaplain chosen and employed by the state. Rather than

apply the Lemon test to the practice, the Supreme Court instead looked to the

history of Congressional prayer. Based on the discrete, historical fact that the same

Congress that authorized the Bill of Rights also authorized legislative prayer before

Congress, the Court found the practice constitutional.[1] As Chief Justice Burger

wrote for the majority:

> On Sept. 25, 1789, three days after Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights. Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress. It has also been followed consistently in most of the states, including Nebraska, where the institution of opening legislative sessions with prayer was adopted even before the State attained statehood.

Marsh, 463 U.S. at 788-790, 103 S.Ct. at 3334-35 (internal citations omitted).

Explaining that historical patterns, standing alone, "cannot justify contemporary

---

[1]Michael W. McConnell also has commented on the singular reasoning behind the *Marsh* decision, stating: "The interesting thing about the opinion is that it is based squarely and exclusively on the historical fact that the framers of the first amendment did not believe legislative chaplains to violate the establishment clause." Michael W. McConnell, *On Reading the Constitution*, 73 CORNELL L. REV. 359, 362 (1988).

violations of constitutional guarantees," the Marsh Court reasoned that historical evidence "sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress - their actions reveal their intent." Id. at 790, 103 S.Ct. at 3335. Thus, Marsh did not evolve from the Supreme Court's modern history of Establishment Clause jurisprudence, but instead, arose out of a "unique" historical fact.[2] See Marsh, 463 U.S. at 790, 103 S.Ct. at 3335.

The Supreme Court has never expanded the Marsh exception. Rather, the Supreme Court consistently has applied the Lemon test in subsequent Establishment Clause cases, including a case in which various religious leaders were invited to give invocations at public school graduations. In Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649 (1992), petitioners challenged Providence, Rhode Island's practice of inviting members of the clergy to give "nonsectarian" invocations and benedictions at the public schools' graduation ceremonies. Applying the Lemon test - and distinguishing Marsh as a narrow decision limited to its unique history - the District Court and the Court of Appeals both ruled the

---

[2] Justice Brennan wrote for the majority in Edwards v. Aguillard, "[t]he Lemon test has been applied in all cases since its adoption in 1971, except in Marsh v. Chambers, where the Court held that the Nebraska Legislature's practice of opening a session with a prayer by a chaplain paid by the State did not violate the Establishment Clause. The Court based its conclusion in that case on the historical acceptance of the practice." Edwards v. Aguillard, 482 U.S. 578, 583, 107 S.Ct. 2573, 2577 (1987)(citations omitted).

46

practice was unconstitutional. See 505 U.S. at 584-85, 112 S.Ct. at 2653. The Supreme Court affirmed, declining the Government's invitation to extend the Marsh exception. Rejecting the argument that state-sponsored prayer comports with the Establishment Clause so long as it is "nonsectarian" and thus advances some sort of "civic religion," the Court explained that the Founders' separation of government from religion was intended to protect the integrity of both. Writing for the majority, Justice Kennedy reminded us:

> The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission. It must not be forgotten then, that while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, the same Clauses exist to protect religion from government interference.

> Id. at 589, 112 S.Ct. at 2656.

In a concurring opinion, Justice Blackmun observed that "[s]ince 1971, the Court has decided 31 Establishment Clause cases. Observing that whether participation in state-sponsored religious exercises was voluntary or coerced was immaterial to the constitutional analysis, Justice Blackmun added:

> We have believed that religious freedom cannot exist in the absence of a free democratic government, and that such a government cannot endure when there is fusion between religion and the political regime. We have believed that religious freedom cannot thrive in the absence of a vibrant religious community and that such a community cannot prosper when it is bound to

the secular. And we have believed that these were the animating principles behind the adoption of the Establishment Clause. To that end, our cases have prohibited government endorsement of religion, its sponsorship, and active involvement in religion, whether or not citizens were coerced to conform.

Id. at 608, 112 S.Ct. at 2667.

Justice Blackmun warned, "[w]hen the government arrogates to itself a role in religious affairs, it abandons its obligation as guarantor of democracy."

In the more than 15 years since the Lee decision, neither the Supreme Court nor this Court has expanded the Marsh exception to include other government prayers. See, e.g. Bunting v. Mellen, 541 U.S. 1019, 124 S.Ct. 1750 (2004) (denying cert. from the Fourth Circuit Court of Appeals, which determined that an invocation of God during Virginia Military Institute's Supper Roll Call ceremony is unconstitutional); Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 120 S.Ct. 2266 (2000) (holding that, despite the District's long-established tradition of sanctioning student-led prayer at varsity football games, the policy of favoring a student led "invocation" at football games violates the Establishment Clause); Jager v. Douglas County Sch. Dist., 862 F.2d 824 (11th Cir. 1989) (declining to use Marsh and holding that the Lemon test was the appropriate test in assessing the constitutionality of invocations delivered prior to public high school games because the practice had an essentially religious purpose, and had the primary effect of advancing religion, and therefore violated the Establishment Clause).

Recently, in Glassroth, the Chief Justice of Alabama installed a Ten Commandments monument in the central rotunda of the Alabama State Judicial Building. Finding no "unambiguous and unbroken history" of displaying religious symbols in judicial buildings, we declined to extend the Marsh exception to allow the monument. We also found that broadening the Marsh exception to other practices would be inconsistent with Establishment Clause jurisprudence, observing:

> The Supreme Court has warned that a broad reading of Marsh would gut the core of the Establishment Clause and has stated that Marsh plainly does not stand for the sweeping proposition ... that all accepted practices 200 years old and their equivalents are constitutional today."

Glassroth, 335 F.3d at 1297 (internal citations and quotations omitted). With vivid and evocative imagery, Judge Carnes, writing for the Court, rejected the Chief Justice's argument that, consistent with the Establishment Clause, the Government "may promote religion so long as it does not command or prohibit conduct." Id. at 1294. As Judge Carnes wrote:

> [I]f we adopted [the Chief Justice's] position . . . Every government building could be topped with a cross, or a menorah, or a statue of Buddha, depending upon the views of the officials with authority over the premises. A crèche could occupy the place of honor in the lobby or rotunda of every municipal, county, state, and federal building. Proselytizing religious messages could be played over the public address system in every government building at the whim of the official in charge of the premises.

> Id. at 1294.

On this matter of first impression, the majority has expanded the Marsh exception to allow prayer at the Cobb County Planning Commission and the Cobb County Commission. This expansion will allow a chorus of government prayers to resound from every "deliberative body" of every locality whose duty it is to address the secular affairs of its constituents. If the Establishment Clause prohibits a religious monument from occupying the lobby of a County building, it defies logic to conclude that the Clause nevertheless sanctions state-sponsored prayer at public meetings upstairs.

The majority cites to the plurality opinion, Van Orden v. Perry, 545 U.S. 677, 125 S. Ct. 2854, 2865 (2005), in which the Supreme Court deviated somewhat from Lemon in allowing a monument with the Ten Commandments to remain on the Texas state capitol grounds. But see Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355 (1984) (applying Lemon in allowing the display of a nativity scene). Although Chief Justice Rehnquist, joined by Justice Scalia, Justice Kennedy, and Justice Thomas, wrote that the Lemon test is "not useful in dealing with the sort of passive monument," he still relied, in part, on the purpose prong of the Lemon test. In delivering his opinion, Justice Rehnquist affirmed that there was a "valid secular purpose" to the monument: "recognizing and commending the [monument's sponsors] for their efforts to reduce juvenile delinquency." Van

Orden, 545 U.S. at 686, 682, 125 S.Ct. 2854, 2856, 2858. In addition, concurring in the judgment, Justice Bryer suggested that an evaluation under Lemon might lead to the same result. 545 U.S. at 700, 125 S.Ct. 2854, 2869.

Thus, the Supreme Court's *ad hoc* approach to the display of religious symbols "has come to 'requir[e] scrutiny more commonly associated with interior decorators than with the judiciary.'" Lee, 505 U.S. at 636, 112 S.Ct. 2649, 2681 (Scalia, J. dissenting). This approach might do for the quiescent display of religious monuments and holiday decorations, however; a more rigorous and consistently applied evaluation is required, and has been applied, when the state assumes the active exercise of public prayer.

III.

I would draw the line at state-sponsored prayer at invocations before the United States Congress and the state legislatures. Marsh is an outlier in Establishment Clause jurisprudence. Therefore, the utmost restraint should be used in expanding its holding to sanction more state-sponsored prayers. As this Court has stated, "[i]n refusing to declare Nebraska's legislative invocation unconstitutional, the Court relied on the 'unique history' associated with the practice of opening legislative sessions with a prayer." Jager, 862 F.2d at 828.[3]

---

[3]In enumerating the constitutional practices that intermingle religion with state activity, Chief Justice Rehnquist did not include prayers in local government meetings, identifying only

51

The two Cobb County commissions do not have the "unambiguous and unbroken history of more than 220 years" of prayer central to the holding in Marsh, nor do they have a "practice of over a century" of invocation prayers as did the Nebraska legislature. Prayers offered at the two Cobb County commissions are not so ancient a practice:[4] the Cobb County Board of Commissioners was founded in 1964,[5] and the Cobb County Planning Commission was founded in 1956.[6] Prayers at the meetings of the commissions hardly can be considered part of the fabric of this nation's history.

County commissions, such as that of Cobb County, also differ fundamentally from state legislative bodies.[7] Under Georgia law, the Cobb County Commission is at best quasi-legislative. It performs executive as well as legislative functions, most notably the administration of certain rules and

---

the Congress and state legislatures. See Lynch v. Donnelly, 465 U.S. 688, 670, 104 S.Ct. 1355, 1357 (1984) ("To forbid the use of this one passive symbol while hymns and carols are sung and played in public places including schools, and while Congress and state legislatures open public sessions with prayers, would be an overreaction contrary to our history and our holdings.")

[4] The transcripts in evidence cover the period from January 1995 to May 2006. [Red Br. 4].

[5] 1964 Ga.L. 2075.

[6] 1956 Ga.L. 2006, *amended by* 1964 Ga.L. 814, 1974 Ga.L. 3872.

[7] In determining the particular functions of a governmental body or official, we must refer to the state law definitions of that entity's functions. See Turquitt v. Jefferson County, 137 F.3d 1285, 1287 (11th Cir.1998) (en banc); Marsh v. Butler County, 225 F.3d 1243 (11th Cir. 2000).

regulations as applied to an individual, entity, or group. While the Georgia Constitution provides for separation of powers between the three branches of government: legislative, judicial and executive, see GA. CONST. art. 1, § 11 (2008), the doctrine of separation of powers applies only to the state and not to municipalities or to county governments. See Bldg. Auth. of Fulton County v. Georgia, 321 S.E.2d 97 (Ga. 1984).[8] County commissions' powers are strictly limited by law, and if there is reasonable doubt as to the existence of a particular power, the doubt is resolved in the negative. See Mobley v. Polk County, 251 S.E.2d 538 (Ga. 1979).[9]

A review of recent minutes from County Commission meetings shows that the Commission performs the executive (administrative) and adjudicative functions expected of municipal government. For example, on January 8, 2008, the Cobb County Board of Commissioners recognized the Murdock Elementary School for being named as a 2008 Georgia School of Excellence by the Georgia Department of Education. In that same meeting, the Board: approved construction contracts; accepted a $1,125.00 donation from Wal-Mart; decided to "suspend for

---

[8]This Court has sharply divided over whether Georgia county commissioners are entitled to the same Eleventh Amendment immunity that is enjoyed by the state legislature. See Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003) (Anderson, J., dissenting, joined by Wilson, J.).

[9]In determining the particular functions of a governmental body or official, we refer to the state law definitions of that entity's functions. See Turquitt v. Jefferson County, 137 F.3d 1285, 1287 (11th Cir. 1998) (en banc); Marsh v. Butler County, 225 F.3d 1243 (11th Cir. 2000).

53

seven (7) days, the Cobb County liquor, beer and wine pouring licenses for

Pappa's Restaurant, Inc"; and approved "the appointment of Mr. Michael Petelle

to the Keep Cobb Beautiful Board." The County Commission also dealt with

county personnel decisions, approving "the reclassification of an existing

Maintenance Worker II position, grade 40, to an Administrative Specialist I

position, grade 41, and further  authorize [sic] the conversion of an existing

part-time Administrative Aide position to a part-time Maintenance Tech position."

I acknowledge that there is dicta within Marsh that can be used to support

the majority's expansive view of Legislative Prayer, including a reference to

"other deliberative bodies." Marsh, 463 U.S. at 786, 103 S.Ct. at 3333. But that is

not the holding of the case, and it is untethered from Marsh's historical

justification.  Marsh should be viewed as an exception, not as establishing a

principle of law that can be extended beyond its reach.[10]  If Marsh is read broadly,

separation of church and state as it now exists becomes relegated only to the

---

[10] For example, do "deliberative bodies" include the courts in this circuit? On August 15, 2008, the Associated Press reported that an Alabama judge, who once wore a judicial robe embroidered with the Ten Commandments, ordered a group appearing before him to hold hands and pray. See also N.C. Civil Liberties Union Legal Found. v. Constangy, 947 F.2d 1145 (4th Cir. 1991) (rejecting a judge's argument that opening court with prayer fell within the Marsh legislative exemption as a "deliberative body," and holding the practice unconstitutional under the Lemon test).

schools.[11]

Describing it as producing an absurd result, the majority credits me with reasoning which is actually the opposite of my view. I do not argue that government prayer by the Boston City Council should be tolerated because it was established in 1822. After all, the Massachusetts Constitution at that time, largely written by John and Samuel Adams, established a state religion financed by tax payers, authorized mandatory church attendance and the imposition of criminal sanctions for blasphemy, and discriminated against Catholics. Steven Waldman, Founding Faith 110-111(New York, Random House, 2008); Leonard W. Levy The Law of the Commonwealth and Chief Justice Shaw 39, 52 - 53 (New York, Oxford University Press, 1957). Most would agree that such practices are unconstitutional today. Marsh's parameters are not based upon vintage alone, but also do not establish a principle susceptible to general application. In my view, prayer is authorized in the Alaska state legislature but not in the Boston City Council. I concede this is an imperfect result, but, consistent with Marsh, it maintains separation of church and state.

If we apply the legislative prayer exception beyond the Congress or state

---

[11]The Sixth Circuit has refused to permit state-sponsored prayer at meetings of school boards despite arguments based upon Marsh. See Coles ex rel. Coles v. Cleveland Bd. of Educ., 171 F.3d 369, 380 (6th Cir. 1999)("Marsh does not support the proposition that government-sponsored prayer at all "deliberative public bodies" is presumptively valid.").

legislatures considered in <u>Marsh</u>, not only does the historical justification disappear, but the entanglement with religion becomes more problematic. As the Supreme Court noted in <u>Lee</u>, "[o]ne timeless lesson is that if citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." 505 U.S. at 592, 112 S.Ct. at 2658.

In <u>Lee</u>, Justice Kennedy pointed out that the atmosphere at the opening of a session of a state legislature allows people to enter and leave with little comment and for a number of reasons. <u>Id</u>. at 596, 112 S.Ct. at 2660. Contrast that with a county commission acting in a quasi-adjudicative role, deciding whether to terminate an employee, suspend a liquor license, or grant a zoning variance. A citizen seeking relief has little choice but to attend, and has no role in the choice of prayer. It is fundamentally illogical for our Establishment Clause jurisprudence to forbid cadets from hearing grace before a meal at VMI, yet require members of the public who attend zoning meetings in Cobb County, Georgia, to hear a prayer asking for guidance - from a deity which may not be their own - on the decision over a parking lot variance.[12]

---

[12]The Cobb County Planning Commission is even further removed from <u>Marsh</u>. It is not a legislative body because it has no rule making or decision making authority. The only action the Planning Commission can take is to ***recommend*** zoning and land use regulations. <u>See</u> Section 134-65, Cobb County Code. Section 134-65 names some "additional powers" of the Planning

56

Yet what is the purpose of the state-sponsored prayer? The commissioners' "finger-through-the-Yellow-Pages" selection procedure belies the notion that the commissioners are seeking guidance from their deity, since it is possible, indeed likely, that no member will share the faith of the person offering the prayers.

Is it then to show a general approval of religion? If so, the Supreme Court has repeatedly condemned governmental preference for religion over non-religion. See Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 17, 28, 109 S.Ct. 890 (1989); Epperson v. Arkansas, 393 U.S. 97, 104, 189 S.Ct. 266 (1968)("The First Amendment mandates governmental neutrality between . . . religion and nonreligion").

The Establishment Clause also does not authorize the promotion of religion, so long as a "diversity" of religious views are represented. As Justice Souter, joined by Justice Stevens and Justice O'Connor presciently warned in Lee, "that position would necessarily compel the government and, inevitably the courts, to make wholly inappropriate judgments about the number of religions the State should sponsor and the relative frequency with which it should sponsor each." Lee, 505 U.S. at 617, 112 S.Ct. at 2671. The majority comes close to suggesting this justification by giving great emphasis to the "diversity" of the prayer givers,

Commission, namely that "[i]t may recommend . . . programs for public improvements and financing thereof."

some of whom came from "the Jewish, Unitarian, and Muslim faiths."

Is this state-sponsored prayer even really prayer? Is it the prayer that we would expect to hear in a church, synagogue or mosque? Or is it watered-down, politically correct prayer? Do references to a deity become largely "laconic," as Judge Story described the majority of references to Christ occurring in the Cobb County Commissions? See Pelphrey v. Cobb County, Ga., 410 F.Supp.2d 1324, 1327 (N.D. Ga. 2006) ("the more elaborate or repetitive Christian references were unusual, and were contained in only a minority of the prayers").

I concur with the majority that judges, as representatives of the government, have no business editing or evaluating the content of prayer. However, I also believe that sponsorship of prayer by these commissions presents a similar, although less direct, danger. When state sponsored prayer is a perfunctory and sterile exercise marking the beginning of a commission agenda, religion becomes the casualty.

The unique historical fact that was the keystone of Marsh's holding was that the very men who voted to include the Bill of Rights in the Constitution, three days later voted for the appointment of a chaplain to lead Congress in prayer. The Court wrote that the "historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they

thought that Clause applied to the practice authorized by the First Congress - their actions reveal their intent." Marsh, 463 U.S. at 790, 103 S.Ct. at 3335. Based on the principle that "[a]n act passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument" ... "is contemporaneous and weighty evidence of its true meaning," the Marsh court determined that congressional prayer is constitutional. Id. (internal citations omitted). It extended that determination to the Nebraska state legislature, an unquestionably legislative body, one that had a "practice of over a century" of prayer. Id.

Justice Brennan's dissent in Marsh, along with other historical scholarship, chronicles the divisions among the drafters of the Establishment Clause over the First Congress' appointment of the chaplain, including James Madison's strident disapproval. The Marsh majority, however, simply looked to the historical chronology to infer the intent of the drafters, and that interpretation is compelling. There is no such compelling history in this case. To divine the intent of the drafters of the Establishment Clause as applied to the Cobb County Commissions or other local government meetings requires too many inferences upon inferences to justify such a radical departure from Lemon and its progeny. Historians may speculate on how James Madison and his contemporaries would regard prayer

before the Cobb County Planning Commission and the Cobb County Commission, but I do not find such an evaluation useful.

IV.

As there was at the drafting of the Establishment Clause, there are those today who desire the State use its power to buttress their own faiths.[13] And, as there was in the eighteenth century, today there are government officials who would oblige them, who would use their positions, and even the municipal buildings that house them, to deliver religious messages and prayers while carrying out the secular duties of their offices. See Glassroth v. Moore, 335 F.3d 1282 (11th Cir. 2003). But the doctrine of "separation and neutrality" leaves no place "for the machinery of the State to affirm their beliefs." Lee, 505 U.S. at 629, 112 S.Ct. at 2677.[14] The"separation" does not simply drive expressions of faith to

---

[13]See also County of Allegheny v. ACLU of Greater Pittsburgh, 492 U.S. 573, 611, 109 S.Ct. at 3110 (1989)("To be sure, in a pluralistic society there may be some would-be theocrats, who wish that their religion were an established creed, and some of them perhaps may be even audacious enough to claim that the lack of established religion discriminates against their preferences. But this claim gets no relief, for it contradicts the fundamental premise of the Establishment Clause itself. the antidiscrimination principle inherent in the Establishment Clause necessarily means that would-be discriminators on the basis or religion cannot prevail.") (Kennedy, J., concurring in part, dissenting in part).

[14]In a letter to the Danbury Baptist Association, in 1802, Thomas Jefferson wrote: "Believing with you that religion is matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legislative powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and state." Letter from Thomas Jefferson to the Danbury Baptist

the periphery of public life, but instead provides a bulwark for Americans' faith from the dulling and often corrupting influence of government.[15] At the same time, the "neutrality" of government in a pluralistic society provides equal opportunity and freedom for those of different faiths and different denominations to flourish and practice their beliefs. See  Marsh, 463 U.S. at 803, 103 S.Ct. at 3342. As Justice Brennan explained in his dissent in Marsh, the Establishment Clause:

> prevent[s] the trivialization and degradation of religion by too close an attachment to the organs of government. The Establishment Clause stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy to permit its unhallowed perversion by a civil magistrate.
>
> Id. (internal citations and quotations omitted).

Adoption of the Establishment Clause was a break from ecclesiastic rule,[16] and the commencement of the separate spheres of religion and government so as to preserve the integrity of both. The hazards that result from ecclesiastic rule,

---

Ass'n (Jan 1, 1801) *in* 8 WRITING OF THOMAS JEFFERSON 113 (H. Washington ed., 1861). But see Wallace v. Jaffree, 472 U.S. 38, 92 (1985) (Rehnquist, J., dissenting) (calling the wall of separation a "misleading metaphor").

[15]"[E]xperience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." Lee, 505 U.S. at 590, 112 S.Ct. at 2657 (quoting *Memorial and Remonstrance Against Religious Assessments* (1785), *in* 8 PAPERS OF JAMES MADISON 301 (W. Rachal, R., et. al. eds., 1973)).

[16]"[A]s late as the time of the Revolutionary war, there were established churches in at least eight of the thirteen former colonies and established religions in at least four of the other five. Engel v. Vitale, 370 U.S. 421, 428, 82 S.Ct. 1261, 1265 (1962).

both for religion and for government, were perceived by the drafters. Those hazards can be observed today in places where the distinctions between religious and secular laws are blurred, where dissent is not tolerated, and where faith becomes a weapon to be wielded by those who seek power. In this country, pious politicians who compete for support through public professions of their own rectitude and devotion take a step toward those hazards, and religion becomes less meaningful through the hollow prayers spoken with the dual purpose of seeking a divine audience and appealing to a secular one.

## V.

As Chief Justice Burger wrote, "[t]he Constitution decrees that religion must be a private matter . . . and while some involvement and entanglement are inevitable, lines must be drawn." Lemon, 403 U.S. at 625, 91 S.Ct. at 2117. I would draw the line at state-sponsored prayer at invocations before the United States Congress and State legislatures. I therefore dissent.